Slip Op. 20-180

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NTSF SEAFOODS JOINT STOCK COMPANY and VINH QUANG FISHERIES CORPORATION,<br><br>      Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>and<br><br>CATFISH FARMERS OF AMERICA, ALABAMA CATFISH INC., AMERICA'S CATCH, CONSOLIDATED CATFISH COMPANIES LLC, DELTA PRIDE CATFISH, INC., GUIDRY'S CATFISH, INC., HEARTLAND CATFISH COMPANY, MAGNOLIA PROCESSING, INC., and SIMMONS FARM RAISED CATFISH, INC.,<br><br>      Defendant-Intervenors. | Before: Jennifer Choe-Groves, Judge<br><br>Court No. 19-00063 |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the 2016–2017 administrative review of the antidumping duty order on certain frozen fish fillets from the Socialist Republic of Vietnam.]

Dated:  December 21, 2020

Kenneth N. Hammer and Jonathan M. Freed, Trade Pacific, PLLC, of Washington, D.C., argued for Plaintiffs NTSF Seafoods Joint Stock Company and Vinh Quang Fisheries Corporation. With them on the brief was Robert G. Gosselink.

Kara M. Westercamp, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Ian A. McInerney, Attorney, Office

of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Jonathan M. Zielinski, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for Defendant-Intervenors Catfish Farmers of America, Alabama Catfish Inc., America's Catch, Consolidated Catfish Companies LLC, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc., and Simmons Farm Raised Catfish, Inc. With him on the brief was James R. Cannon.

Choe-Groves, Judge:  This case involves frozen fish fillets, including regular, shank, and strip fillets and portions thereof, of the species *Pangasius Bocourti*, *Panganius Hypophthalmus* (also known as *Pangasius Pangasius*) and *Pangasius Micronemus*.  Plaintiffs NTSF Seafoods Joint Stock Company ("NTSF") and Vinh Quang Fisheries Corporation ("Vinh Quang") (collectively, "Plaintiffs") bring this action challenging the final results of the U.S. Department of Commerce ("Commerce") in the 2016–2017 administrative review of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam"). See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam ("Final Results"), 84 Fed. Reg. 18,007 (Dep't Commerce Apr. 29, 2019) (final results of antidumping duty administrative review; 2016–2017; see also Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Mem. for the Final Results of the Fourteenth Antidumping Duty Admin. Review: 2016–2017 (Dep't Commerce Apr. 19, 2019), ECF No. 24-3, PD 547 ("Final IDM").[1] Before the court are Plaintiffs' Motion for Judgment on the Agency Record Pursuant to Rules 56.1 and 56.2, ECF Nos. 35, 36, and Response to Plaintiffs' Motion for Judgment on the Agency Record and Motion to Partially Dismiss, ECF Nos. 44, 45 ("Def. Resp."), filed by Defendant United States ("Defendant").  For the following reasons, the court sustains in part and remands in part the Final Results and denies the Motion to Partially Dismiss.

---

[1] Citations to the administrative record reflect public record ("PD") and confidential record ("CD") document numbers.

## ISSUES PRESENTED

The court reviews the following issues:

1. Whether Commerce's selection of financial statements in its calculation of surrogate financial ratios is supported by substantial evidence;

2. Whether Commerce's calculation of surrogate values for NTSF's fingerlings is supported by substantial evidence; and

3. Whether Commerce's denial of byproduct offsets for fish oil and fish meal is supported by substantial evidence.

## BACKGROUND

Commerce initiated the fourteenth administrative review of the antidumping duty order of frozen fish fillets from Vietnam for the period covering August 1, 2016 through July 31, 2017. Initiation of Antidumping and Countervailing Duty Admin. Reviews, 82 Fed. Reg. 48,051, 48,053 (Dep't Commerce Oct. 16, 2017) (initiation notice).  Commerce selected Hung Vuong Group and NTSF as mandatory respondents for individual examination.[2]  See Fourteenth Admin. Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Second Selection of Resp't for Individual Review at 4, PD 163 (Jan. 5, 2018); Fourteenth Admin. Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: 2nd Replacement Selection of Resp't for Individual Review at 4, PD 209 (Feb. 7, 2018).  Commerce selected Indonesia as

---

[2] Commerce selected Vinh Hoan Corporation and Bien Dong Seafood Company, Ltd. initially as mandatory respondents.  Fourteenth Admin. Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Selection of Resp'ts for Individual Review at 6, PD 50 (Nov. 16, 2017).  Both withdrew their requests for review.  See Frozen Fish Fillets from the Socialist Republic of Vietnam: Withdraw of Request for Admin. Review – Vinh Hoan Corporation, PD 132 (Dec. 26, 2017); Frozen Fish Fillets from Vietnam – Withdrawal of Request for Admin. Review, PD 173 (Jan. 12, 2018) (withdrawal of Bien Dong Seafood Company, Ltd.); Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Partial Withdrawal of Request for Admin. Review, PD 118 (Dec. 22, 2017); Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Partial Withdrawal of Request for Admin. Review, PD 175 (Jan. 12, 2018). Commerce selected Hung Vuong Group and NTSF as replacement mandatory respondents.

the primary surrogate country.  See Certain Frozen Fish Fillets from the Socialist Republic of

Vietnam: Decision Mem. for the Prelim. Results, Prelim. Determination of No Shipments, and

Partial Rescission of the 2016–2017 Antidumping Duty Admin. Review at 12, PD 478 (Dep't

Commerce Sept. 13, 2018) ("Prelim. DM").

      Commerce assigned weighted-average dumping margins of $3.87 per kilogram to Hung

Vuong Group, $1.37 per kilogram to NTSF, and the all-others rate of $1.37 per kilogram to Vinh

Quang in the Final Results published on April 29, 2019.  Final Results, 84 Fed. Reg. at 18,008.

Commerce applied the all-others rate to the separate rate-eligible respondents not selected for

individual examination based on NTSF's calculated margin, including Vinh Quang.  See id.;

Final IDM at 49.  In accordance with Commerce's policy, the Final Results included a statement

of Commerce's "inten[t] to issue appropriate assessment instructions" to U.S. Customs and

Border Protection ("Customs") fifteen days after the date of publication.  Final Results, 84 Fed.

Reg. at 18,008.

      Plaintiffs commenced this action on May 14, 2019.  See Summons, ECF No. 1.  The next

day, Commerce issued liquidation instructions to Customs, sixteen days after publication of the

Final Results.  See Antidumping Duty Admin. Review of Certain Frozen Fish Fillets from the

Socialist Republic of Vietnam: Official R. Addendum Docs. – NTSF Liquidation Instrs., CD 561

(Dec. 11, 2019) ("Liquidation Instructions").  Customs issued three Notices of Action (Form CF-

29): on May 29, 2019 as to one entry; on June 5, 2019 as to nineteen entries; and on June 5, 2019

as to forty-nine entries.  See Mem. in Supp. of Mot. for J. Upon the Agency R. of Pls. NTSF

Seafood Joint Stock Co. & Vinh Quang Fisheries Corp. Attachs. 1–3, ECF Nos. 35-2, 36-2 ("Pls.

Br.").  All sixty-nine NTSF entries were liquidated on May 31, 2019, thirty-two days after

publication of the Final Results.  Id. Attach. 4.  Commerce did not issue liquidation instructions

for Vinh Quang's entries.  Defendant consented to Vinh Quang's proposed order for a statutory

injunction to enjoin liquidation of Vinh Quang's entries.  Form 24 Am. Order for Statutory Inj.

Upon Consent, ECF No. 12.  The court entered a statutory injunction enjoining liquidation of

Vinh Quang's entries pending resolution of this matter.  Order for Statutory Inj. Upon Consent,

ECF No. 13.  The court issued a letter on August 26, 2020 requesting that Defendant consider

restoring NTSF's subject entries to unliquidated status.  Letter, ECF No. 62.  Defendant

consented.  Def.'s Resp. to the Court's Letter, ECF No. 63.  The court ordered that NTSF's

subject entries be restored to unliquidated status.  Confidential Order, ECF No. 65; Order, ECF

No. 66.

In the final results of administrative reviews, Commerce publishes a statement of intent to

issue liquidation instructions to Customs fifteen days after publication.  Announcement

Concerning Issuance of Liquidation Instrs. Reflecting Results of Admin. Reviews, International

Trade Administration (Nov. 9, 2010), https://enforcement.trade.gov/download/liquidation-

announcement-20101109.html (last visited Dec. 21, 2020); see Def. Resp. at 28.  Parties are

afforded thirty days after publication of final results to file a summons and thirty days thereafter

to file a complaint to trigger the jurisdiction of this Court.  19 U.S.C. § 1516a(a)(2).  Because

liquidation of entries is final and renders the administrative determination unreviewable by the

Court, Commerce's liquidation instruction policy has the potential to cut the time that parties

have to file suit unreasonably short.  The problem is not Commerce's issuance of liquidation

instructions, it is the timing of the resulting liquidations.

If Commerce were to act so quickly as to foreclose interested parties from obtaining

judicial review, Commerce's actions would be unreasonable, as would have occurred in this case

absent the court's intervention requesting Defendant's consent to restoring unliquidated status.

The Court determines whether Commerce acted unreasonably on a case-by-case basis.

Commerce issued liquidation instructions for NTSF's entries sixteen days after publication of the

<u>Final Results</u>.  <u>See</u> Liquidation Instructions.  NTSF's entries were liquidated thirty-two days

after publication of the <u>Final Results</u>, before expiration of the statutory period for filing a

complaint.  <u>See</u> Pls. Br. Attach. 4.  NTSF could potentially have been deprived of its right to

obtain judicial review.  Defendant consented, however, to restoring NTSF's entries to

unliquidated status, and Plaintiffs were able to obtain judicial review of the antidumping

determination.  For these reasons, the court dismisses Defendant's Motion to Partially Dismiss as

moot.

      Because Commerce is best situated to consider the interests of all parties and avoid

unreasonably quick liquidations, the court advises Commerce to consider adopting changes to

the liquidation instruction policy to ensure that parties are not deprived of their right to judicial

review.

**JURISDICTION AND STANDARD OF REVIEW**

      The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C.

§ 1581(c).  The court shall hold unlawful any determination found to be unsupported by

substantial evidence on the record or otherwise not in accordance with law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).

**DISCUSSION**

I.      **Selection of Financial Statements in Calculation of Surrogate Financial Ratios**

      The court first addresses the issue of whether Commerce's selection of financial

statements in its calculation of surrogate financial ratios is supported by substantial evidence.

Plaintiffs challenge Commerce's selection of the financial statements of Japfa Comfeed

Indonesia ("Japfa Comfeed") as not representing the best available information to use in

calculating surrogate financial ratios.  <u>See</u> Pls. Br. at 24–34.  Commerce calculated surrogate

financial ratios for Plaintiffs' profit, factory overhead, and selling, general, and administrative

expenses based on the financial statements of two producers in the surrogate country of

Indonesia, PT Dharma Samudera Fishing Industries ("DSFI") and Japfa Comfeed.  Final IDM at

47–48; Prelim. DM at 16.  Plaintiffs assert that DSFI, an Indonesian company that produced

primarily fish fillets, was the most comparable producer and that only DSFI's financial

statements should have been used by Commerce as the best available information to calculate

surrogate financial ratios.  Pls. Br. at 25–26, 32–34.

Plaintiffs fault Commerce's selection of Japfa Comfeed's financial statements as non-

comparable, based on Plaintiffs' argument that aquaculture activities were not a significant

enough portion of Japfa Comfeed's overall operations.  Pls.' Br. in Reply and in Resp. to Def.'s

Partial Mot. to Dismiss at 13, ECF No. 52 ("Pls. Reply"); see Pls. Br. at 29–32.  The court

observes that Plaintiffs focus mainly on the assertion that aquaculture was a relatively small

portion of Japfa Comfeed's overall businesses, even though Plaintiffs do not dispute that some

portion of Japfa Comfeed's operations involved fish production and aquaculture.  Plaintiffs argue

that Commerce's use of Japfa Comfeed's financial statements was contrary to Commerce's

practice of selecting financial statements from a producer of *primarily* comparable merchandise.

Pls. Reply at 14; see Pls. Br. at 28–29.  Plaintiffs acknowledge Commerce's practice of relying

on financial statements from more than one producer to calculate surrogate financial ratios (and

do not dispute Commerce's inclusion of DSFI's financial data), but Plaintiffs argue that

Commerce's use of Japfa Comfeed's financial statements was unreasonable due to Commerce's

failure to support with substantial evidence its inclusion of Japfa Comfeed's data.  Pls. Br. at 30–

34; Pls. Reply at 16.

Defendant and Defendant-Intervenors Catfish Farmers of America ("CFA"), Alabama

Catfish Inc., America's Catch, Consolidated Catfish Companies LLC, Delta Pride Catfish, Inc.,

Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc., and Simmons

Farm Raised Catfish, Inc. (collectively, "Defendant-Intervenors") respond that Commerce's

inclusion of Japfa Comfeed's financial statements is supported by substantial evidence and in

accordance with Commerce's standard practices because Japfa Comfeed had fish production

businesses, including tilapia operations, during the relevant period of review.  Def. Resp. at 18–

20; Resp. Br. of the Catfish Farmers of America & Individual U.S. Catfish Processors at 16–18,

ECF Nos. 46, 47 ("Def.-Intervs. Resp.").

Defendant asserts that the relevant statute allows Commerce to select data from

companies that produce identical or comparable merchandise and that Commerce is not required

to choose companies that *primarily* produce comparable merchandise.  Def. Resp. at 20 (citing

19 U.S.C. § 1677b(c)(2)(A); 19 C.F.R. § 351.408(c)(4)).  Defendant states that Commerce is not

required to match the merchandise production of the comparison companies with the exact

production experience of Plaintiffs.  Id. (quoting Final IDM at 48); see Def.-Intervs. Resp. at 18

(noting that Commerce has broad discretion in selecting the financial statements upon which to

rely and that there is no minimum threshold of similar production experience required).

Defendant notes that Commerce cited record evidence of Japfa Comfeed's articles of association,

financial statements, and website to support Commerce's determination that Japfa Comfeed

produced comparable merchandise and that its data was appropriate to use in the calculation of

surrogate financial ratios.  Def. Resp. at 18–19.  Defendant argues that Commerce's selection of

Japfa Comfeed's and DSFI's financial statements together, as a basis for the surrogate financial

ratio calculations, was in accordance with Commerce's standard practices because Commerce

prefers to rely on financial statements from multiple producers to normalize any potential

distortions that may arise from using a single producer.  Id. at 18, 21–22 (citing Final IDM at 47–

48).  Defendant contends that Commerce's use of Japfa Comfeed's financial statements fell

within Commerce's wide discretion when selecting sources used to calculate surrogate financial ratios.  Id. at 21.

In antidumping proceedings involving non-market economies, the relevant statute authorizes Commerce to calculate normal value using the best available information in a market economy country or countries considered to be appropriate by Commerce to value factors of production and other costs and expenses.  19 U.S.C. § 1677b(c)(4).  When merchandise is exported from a non-market economy and Commerce determines that available information does not permit the normal value of subject merchandise to be determined using sales in the home market, Commerce determines normal value based on the value of the factors of production utilized in the production of the merchandise.  Id. § 1677b(c)(1).  The statute provides that Commerce shall value factors of production based on the best available information from a surrogate market economy country or countries.  Id.  When calculating surrogate financial ratios, Commerce "normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country."  19 C.F.R. § 351.408(c)(4); see Weishan Hongda Aquatic Food Co. v. United States ("Weishan"), 917 F.3d 1353, 1365 (Fed. Cir. 2019).  The court notes that neither the statute nor the relevant regulations require that the comparable production be *primarily* similar; the inquiry focuses on whether the producers in the surrogate country produce identical or comparable merchandise.  Commerce has broad discretion to determine what constitutes the best available information.  Weishan, 917 F.3d at 1364–65.

The court finds that Commerce supported its selection of Japfa Comfeed's financial data with substantial evidence on the record.  Commerce determined that both DSFI and Japfa Comfeed were producers of comparable merchandise, including fisheries operations and aquaculture.  Final IDM at 47–48.  Commerce cited evidence on the record, including Japfa Comfeed's articles of association, financial statements, and website, which indicated that Japfa

Comfeed was involved in fisheries operations and produced comparable merchandise such as

frozen tilapia fillets.  Id. (citing Certain Frozen Fish Fillets from the Socialist Republic of

Vietnam: [Defendant-Intervenors'] Submission of Proposed Factor Values Ex. I-10F, PD 262–

319 (Mar. 22, 2018) ("Def.-Intervs. Mar. 22, 2018 Letter")) (stating that frozen tilapia deep

skinned fillets were "available in '3-5, 5-7, 7-9, 9-11 oz.' individually quick frozen (IQF) or

vacuum pack").  Commerce noted that Japfa Comfeed's website stated that its "tilapia operation

[was] . . . the largest of its kind in Indonesia."  Id. at 47.  In addition, the evidence cited by

Commerce indicated that Japfa Comfeed's aquaculture activities were its third highest revenue

source among its lines of business.  See id. n.337 (citing Def.-Intervs. Mar. 22, 2018 Letter Exs.

I-10A, I-10F).

        Plaintiffs do not contest that Japfa Comfeed produced comparable merchandise.  See Pls.

Br. at 25–32.  Plaintiffs argue that Japfa Comfeed's financial statements were not the best

available information for Commerce to use because Japfa Comfeed did not *primarily* produce

comparable merchandise.  See id. at 25–26; Pls. Reply at 13.  As stated previously, Commerce is

not required under the law to select financial statements from a producer that *primarily* produces

comparable merchandise, but is required only to gather information from producers of identical

or comparable merchandise in the surrogate country.  See 19 U.S.C. § 1677b(c)(1); 19 C.F.R.

§ 351.408(c)(4); see also Weishan, 917 F.3d at 1365.  The court concludes that Commerce's

determination that Japfa Comfeed produced comparable merchandise in the business areas of

fisheries operations and aquaculture is reasonable and supported by substantial evidence.

        Plaintiffs argue that Commerce should have used only DSFI's financial statements, rather

than a combination of DSFI's and Japfa Comfeed's information.  Pls. Br. at 32–34.  The parties

agree that Commerce's standard practice is to use multiple financial statements to calculate

surrogate financial ratios when possible.  See id. at 32; Def. Resp. at 21.  "Generally, if more

than one producer's financial statements are available, Commerce averages the financial ratios

derived from all the available financial statements." Ad Hoc Shrimp Trade Action Comm. v.

United States, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (citing Dorbest Ltd. v. United States, 604

F.3d 1363, 1368 (Fed. Cir. 2010)).  Commerce explained that it prefers to use multiple financial

statements in order to normalize any potential distortions that may arise from using the

statements of a single producer.  Final IDM at 48.  In accordance with its standard practice,

Commerce selected two producers of comparable merchandise, Japfa Comfeed and DSFI, and

averaged their financial ratios.  See id. at 47–48.  The court concludes that Commerce's use of

Japfa Comfeed's financial statements together with DSFI's financial statements in order to

normalize any potential distortions that could arise when calculating an average surrogate

financial ratio is in accordance with the law.

Because the court concludes that Commerce's determination that Japfa Comfeed's

financial statements should be included in the best available information is supported by

substantial evidence, and Commerce's calculation of average surrogate financial ratios using the

financial statements of both DSFI and Japfa Comfeed is in accordance with the law, the court

sustains Commerce's use of Japfa Comfeed's and DSFI's financial statements together to

calculate surrogate financial ratios for NTSF.

## II.    Calculation of Surrogate Values for NTSF's Fingerlings

The second issue considered by the court is whether Commerce's surrogate value

calculation for NTSF's fish fingerlings is supported by substantial evidence.  Commerce

calculated surrogate values for NTSF's fingerlings using data provided by the Indonesian

Ministry of Marine Affairs and Fisheries ("IMMAF").  See Final IDM at 44–46; Fourteenth

Admin. Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Surrogate

Values for the Prelim. Results at 3, PD 487 (Dep't Commerce Sept. 4, 2018) ("Prelim. Surrogate Values Mem.").

Plaintiffs challenge Commerce's selection of data provided by the IMMAF as not representing the best available information to use in calculating surrogate values for NTSF's fingerlings. Pls. Br. at 11–21. Plaintiffs argue that the fingerlings per kilogram conversion ratio included in the 2012 data from the IMMAF ("2012 Data") was inaccurate and contradicted by other record evidence. Id. at 16–18; Pls. Reply at 3–8. Plaintiffs assert that Commerce should have used different data, such as NTSF's own data that it provided to Commerce, to calculate surrogate values. Pls. Br. at 16–18. Plaintiffs contend that Commerce's application of a conversion ratio intended for 5–6 inch fingerlings to NTSF's fingerlings larger than 6 inches conflicted with Commerce's standard practice of using size-specific conversion ratios. Id. at 18–21; see Pls. Reply at 2, 9.

Defendant responds that mixing data from Vietnam, the location of NTSF's products, and from the surrogate country of Indonesia would result in distortions in the surrogate values. Def. Resp. at 15. Defendant argues that the 2012 Data is the best available information to calculate surrogate values for fingerlings over 5 inches and that Commerce's surrogate value calculation is supported by substantial evidence. Id. at 14.

Pursuant to 19 U.S.C. § 1677b(c), Commerce calculates normal value for subject merchandise using the best available information from surrogate countries to value production factors. 19 U.S.C. § 1677b(c). The court does not evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information. Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1379 (Fed. Cir. 2015).

Commerce used the 2016–2017 data from the IMMAF ("2016–2017 Data") to calculate surrogate values for NTSF's fingerlings up to 5 inches in length.[3]  See Prelim. Surrogate Values Mem. at 3.  The 2016–2017 Data included the number of fingerlings per kilogram for fingerlings up to 6 inches but only stated a price for fingerlings up to 5 inches.  See id. Attach. 1; Def.-Intervs. Mar. 22, 2018 Letter Ex. I-3C.  Commerce applied the 2012 Data to calculate surrogate values for NTSF's fingerlings over 5 inches, because only the 2012 Data included a price for 5–6 inch fingerlings.  Final IDM at 45; see Def.-Intervs. Mar. 22, 2018 Letter Ex. I-3C.  Commerce used the most contemporaneous data from the surrogate country of Indonesia that provided both fingerlings per kilogram and corresponding prices from the period of review.  See Prelim. Surrogate Values Mem. at 3, Attach. 1.

Plaintiffs do not challenge the source of the data, indicating that "use of [data provided by the IMMAF] is not in and of itself so problematic."  Final IDM at 45.  Plaintiffs challenge the accuracy of the fingerling per kilogram conversion ratio within the 2012 Data and the application of the 2012 Data to fingerlings over 6 inches.  Pls. Br. at 15–16.  The court observes that Plaintiffs' essential argument is that Commerce should have used NTSF's own data rather than the 2012 Data chosen by Commerce.

---

[3] To value fingerlings from 0.5 to 5 inches in length, Commerce used 2016–2017 pricing from an April 29, 2016 letter and 2017–2018 pricing from an August 1, 2018 letter from the IMMAF General Secretariat, Statistical Data and Information Center.  Prelim. Surrogate Value Mem. at 3, Attach. 1; see also Def.-Intervs. Mar. 22, 2018 Letter Ex. I-3C, Attach. 2 (original letter listing 2014, 2015, and 2016 prices in various size bands ranging from 0.5–1.0 inch to 4–5 inches but not including information for fingerlings larger than 5 inches in length); Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: CFA's Pre-Preliminary Surrogate Value Submission Ex. 3, Attach. 2, PD 445–60 (Aug. 3, 2018) ("Def.-Intervs. Aug. 3, 2018 Letter") (original letter listing 2016–2018 pricing in various size bands ranging from 0.5–1.0 inch to 4–5 inches but indicating that fingerlings larger than 5 inches in length are "rarely traded").

### A.    Accuracy of the 2012 Data

Plaintiffs argue that Commerce's use of the 2012 Data's conversion ratio is unsupported by substantial evidence because there is differing data on the record regarding the number of 5–6 inch fingerlings per kilogram.  Id. at 16–18.  Plaintiffs point to no direct evidence, however, showing that the 2012 Data's conversion ratio of 100 5–6 inch fingerlings per kilogram is inaccurate.  See id.  Plaintiffs cite merely to other record evidence indicating different numbers of 5–6 inch fingerlings per kilogram.  Id.; see also id. at 15 (fifty-six 5–6 inch fingerlings per kilogram); Def.-Intervs. Aug. 3, 2018 Letter Ex. 3, Attach. 3 (fewer than seventy 5–6 inch fingerlings per kilogram); Def.-Intervs. Aug. 3, 2018 Letter Ex. 3, Attach. 2 (seventy 5–6 inch fingerlings per kilogram); Def.-Intervs. Mar. 22, 2018 Letter Ex. I-3C, Attach. 3 (one hundred 5–6 inch fingerlings per kilogram).  The court observes that a number of factors can affect the exact ratio between length and weight.  See Certain Frozen Fish Fillets from Vietnam: Surrogate Values Attach. 4-F, PD 253–54 (Mar. 22, 2018) (stating that factors such as food, water temperature, and disease can affect the fingerling length-to-weight ratio).  As a result, the court recognizes that variances in the exact number of 5–6 inch fingerlings per kilogram can occur.

Defendant explains that Commerce chose the 2012 Data because it was the only data set from the surrogate country of Indonesia that contained both fingerlings per kilogram and price for 5–6 inch fingerlings.  Def. Resp. at 14–15.  Commerce stated that it selected data that included both quantity and price amounts to avoid potential distortions.  Final IDM at 44–45.  No data from Indonesia, other than the 2012 Data, included both quantity and price.  See Prelim. Surrogate Values Mem. at 3, Attach. 1.

The court concludes that Commerce's determination that the 2012 Data was the best available information to calculate surrogate values for NTSF's 5–6 inch fingerlings is supported by substantial evidence, in light of Commerce's explanation that it sought both quantity and

price information to avoid potential distortions and the lack of contrary evidence from NTSF

when viewing the record as a whole.  The court sustains Commerce's application of the 2012

Data to calculate surrogate values for NTSF's 5–6 inch fingerlings.

### B.    Application of 2012 Data to Fingerlings Over 6 Inches

Plaintiffs argue that Commerce's application of the 2012 Data to NTSF's fingerlings

larger than 6 inches is unsupported by substantial evidence.  Pls. Br. at 18–21.  The record

reflects that NTSF reported fingerling consumption data as fingerlings per kilogram.  Frozen

Fish Fillets from Vietnam – Resp. to Section D Suppl. Questionnaire at 1, PD 225 (Feb. 26,

2018) ("NTSF Suppl. Questionnaire Resp.").  NTSF converted this data to inches per piece,

determining that NTSF's fingerlings ranged from 5.866 to 7.008 inches in length.  See Frozen

Fish Fillets from Vietnam: Resp. to Req. for Surrogate Value Information Ex. SV-5, PD 320–33

(Mar. 22, 2018).  For NTSF's fingerlings that were 5–6 inches and larger, Commerce applied the

2012 Data to calculate surrogate values.  Final IDM at 44.

The parties do not dispute that the number of fingerlings per kilogram decreases as the

size of the fingerlings increases.  "[T]he relationship between fingerling lengths and weights [is]

not linear."  Id. at 45.  Plaintiffs argue that Commerce's use of the 2012 Data's 5–6 inch

conversion ratio was less accurate when applied to larger-sized fingerlings.  See Pls. Br. at 18–

21.  Plaintiffs assert that the conversion rates provided in NTSF's own data, by comparison, are

more accurate and should have been used by Commerce instead of the 2012 Data.  Id. at 19–20.

Commerce's surrogate value determination need not be exact.  See Nation Ford Chem.

Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (citing Sigma Corp. v. United States,

117 F.3d 1401, 1407 (Fed. Cir. 1997)).  Commerce explained that the 2012 Data was the best

available information to apply to NTSF's fingerlings that were 5–6 inches and larger because the

2012 Data contained critical information regarding fingerling length, fingerlings per kilogram,

and corresponding price.  Final IDM at 44–45.  Commerce noted that it selected the 2012 Data

for consistency, accuracy, and availability of conversion factors from the same credible

government source, the IMMAF.  Id. at 45.  In addition, Commerce explained that mixing

NTSF's Vietnamese data with Indonesian surrogate values would be internally inconsistent and

would "distort the ending value." Id. at 44.

The court concludes that Commerce's selection of the 2012 Data as the best available

information to calculate surrogate values for NTSF's fingerlings is supported by substantial

evidence and reasonable in light of Commerce's justifications of consistency, accuracy, and

availability of comparable conversion factors from the same source and surrogate country.  The

court sustains Commerce's application of the 2012 Data to calculate surrogate values for NTSF's

fingerlings that were 5–6 inches and larger.

### III.    Denial of Byproduct Offsets for Fish Oil and Fish Meal

The third issue considered by the court is whether Commerce's denial of byproduct

offsets for fish oil and fish meal byproducts is supported by substantial evidence.

In calculating normal value for NTSF, Commerce granted offsets for fish head and bone

byproducts generated during the period of review, but denied offsets for fish oil and fish meal

byproducts.  Final IDM at 52–53.  Plaintiffs assert that the record evidence showed that NTSF

produced fish oil and fish meal byproducts through a tolling contract with a processor and sold

those byproducts.  Pls. Br. at 23–24.  Plaintiffs argue that Commerce's denial of offsets for fish

oil and fish meal byproducts is unsupported by substantial evidence.  Id. at 24.  Defendant

responds that Commerce denied byproduct offsets for fish oil and fish meal correctly because

NTSF's processing contract was for a sale of goods and was not a tolling contract.  Oral Arg. Tr.

at 46; Def. Resp. at 17–18.  Defendant argues that NTSF failed to provide enough information to

warrant byproduct offsets for fish oil and fish meal and that Commerce's denial of byproduct

offsets is supported by substantial evidence.  Def. Resp. at 17–18.

Pursuant to 19 U.S.C. § 1677b(c), Commerce calculates normal value for subject

merchandise using the best available information from surrogate countries to value production

factors.  19 U.S.C. § 1677b(c).  Commerce examines the quantities of raw materials employed by

a company when calculating normal value.  See id. § 1677b(c)(3)(B).  As not all raw materials

are incorporated into the final product, Commerce provides offsets for byproducts generated

during the production process.  See Arch Chems., Inc. v. United States, 33 CIT 954, 956 (2009);

Ass'n of Am. School Paper Suppliers v. United States, 32 CIT 1196, 1205 (2008); see also

Tianjin Magnesium Int'l Co. v. United States, 34 CIT 980, 993 (2010) (The antidumping statute

does not prescribe a method for calculating byproduct offsets, instead leaving the decision to

Commerce.).  Commerce values byproduct offsets based on the best available information.  See

19 U.S.C. § 1677b(c)(1); An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States, 41

CIT __, __, 203 F. Supp. 3d 1256, 1273 (2017).  The producer bears the burden of substantiating

any byproduct offsets and must present Commerce with sufficient information to support its

claims for offsets.  See Arch Chems., 33 CIT at 956.  The producer must show that the byproduct

of the production of the subject merchandise "is either resold or has commercial value and re-

enters the [producer's] production process."  Id.; see Am. Tubular Prods., LLC v. United States,

38 CIT __, __, Slip Op. 14-116 at 17 (Sept. 26, 2014).

Defendant and Defendant-Intervenors emphasize that NTSF failed to demonstrate that

NTSF actually sold fish oil and fish meal byproducts and that NTSF failed to reconcile its fish

waste production to its byproduct sales.  Def. Resp. at 17–18; Def.-Intervs. Resp. at 15–16; see

also Final IDM at 52–53.  The court observes, however, that record evidence may contradict

Defendant's assertion that NTSF failed to show that it sold fish oil and fish meal byproducts

during the period of review.  Specifically, the court notes NTSF's assertion that it provided

record evidence of fish oil and fish meal sales during the last three months of the period of

review and that it reconciled the total value of byproduct sales to its sales ledger, trial balance,

and audited financial statements.  See, e.g., Frozen Fish Fillets from Vietnam – Section D Resp.

& Section D App. Resp. at D-16, Ex. D-13, CD 92–95 (Jan. 18, 2018); Frozen Fish Fillets from

Vietnam – NTSF's Resp. to the Department's Suppl. Sections C & D Questionnaire at Supp CD-

40, CD 179–97 (May 15, 2018) ("NTSF Suppl. Resp."); Pls. Reply at 9–12.

    Central to the parties' dispute is whether NTSF's contract with an unaffiliated processor

to process fish head and bone byproducts into fish oil and fish meal ("Processing Contract") was

a sale of goods contract or a tolling contract.  Oral Arg. Tr. at 46; see NTSF Suppl. Resp. Ex.

Supp CD-47.  The court does not opine whether NTSF's Processing Contract was a sale of goods

contract or a tolling contract, but notes generally that toll manufacturing is defined as "[a]n

arrangement under which a customer provides the materials for a manufacturing process and

receives the finished goods from the manufacturer.  The same party owns both the input and the

output of the manufacturing process."  Toll Manufacturing, Black's Law Dictionary (11th ed.

2019); see Atar, S.r.L. v. United States, 35 CIT 849, 850 (2011) (citing United States v. Eurodif

S. A., 555 U.S. 305, 312–13 (2009)) ("In a tolling arrangement, a producer employs a

subcontractor that provides processing services for, or material for incorporation into, the

merchandise that is sold by the producer."); see also Mid Continent Steel & Wire, Inc. v. United

States, 42 CIT __, __, Slip Op. 18-56 at 4–6 (May 22, 2018).

    The court concludes that Commerce's denial of byproduct offsets for fish oil and fish

meal is unsupported by substantial evidence in light of potentially contradictory evidence on the

record and viewing the record as a whole.  The court remands for Commerce to explain its

analysis of the record evidence cited by NTSF or otherwise change its determination.

## CONCLUSION

The court sustains Commerce's use of Japfa Comfeed's financial statements to calculate surrogate financial ratios and Commerce's use of the 2012 Data to calculate surrogate values. The court remands Commerce's denial of byproduct offsets for further consideration in accordance with this opinion.

Accordingly, it is hereby

**ORDERED** that Defendant's Motion to Partially Dismiss is denied; and it is further

**ORDERED** that the <u>Final Results</u> are remanded to Commerce for further proceedings consistent with this opinion; and it is further

**ORDERED** that Commerce shall afford the parties at least twelve (12) business days to comment on the draft remand results; and it is further

**ORDERED** that this action shall proceed according to the following schedule:

1. Commerce shall file the remand results on or before February 19, 2021;

2. Commerce shall file the administrative record on or before March 12, 2021;

3. Comments in opposition to the remand results shall be filed on or before April 9, 2021;

4. Comments in support of the remand results shall be filed on or before May 7, 2021; and

5. The joint appendix shall be filed on or before May 28, 2021.

   /s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:    December 21, 2020
          New York, New York