A-552-801
Remand (Slip Op 20-180)
**Public Document**
E&C/OV: JB

**FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**
*NTSF Seafoods Joint Stock Company and Vinh Quang Fisheries Corporation v. United States,* **Court No. 19-00063, Slip Op. 20-180 (CIT December 21, 2020)**

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination in accordance with the opinion and remand order of the U.S. Court of International Trade (the Court) in *NTSF Seafoods Joint Stock Company and Vinh Quang Fisheries Corporation v. United States*, Court No. 19-00063, Slip Op. 20-180 (CIT December 21, 2020) (*Remand Order*). These final results of redetermination concern the 14th administrative review of the antidumping duty order on certain frozen fish fillets (fish fillets) from the Socialist Republic of Vietnam (Vietnam) covering the period of review (POR) August 1, 2016, through July 31, 2017.[1]

The Court sustained, in part, and remanded, in part, certain aspects of the *Final Results*. In particular, the Court remanded Commerce's denial of by-product offsets for further consideration. In accordance with the *Remand Order*, and after further review, Commerce is granting NTSF Seafoods Joint Stock Company (NTSF) by-product offsets for its reported fish meal and fish oil during the POR. For the reasons discussed below, we find that NTSF's fish meal and fish oil by-products were produced pursuant to a tolling arrangement with an unaffiliated processor and later sold to unaffiliated purchasers. Accordingly, we now find that NTSF's requested by-product offsets for sales of fish meal and fish oil are warranted.

---

[1] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results, and Final Results of No Shipments of the Antidumping Duty Administrative Review; 2016–2017*, 84 FR 18007 (April 29, 2019) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

## II. BACKGROUND

On October 16, 2017, Commerce initiated the 14th administrative review of fish fillets from Vietnam.[2] Because of the large number of exporters covered by the review, on November 16, 2017, Commerce selected the two largest exporters, Vinh Hoan Corporation (Vinh Hoan) and Bien Dong Seafood Co., Ltd. (Bien Dong), for individual review.[3] Subsequently, all review requests for Vinh Hoan and Bien Dong were timely withdrawn, and on February 7, 2018, Commerce selected NTSF for individual review as a replacement mandatory respondent.[4]

On September 13, 2018, Commerce published the *Preliminary Results*.[5] In the *Preliminary Results*, Commerce calculated an individual dumping margin for NTSF.[6] In calculating NTSF's margin, Commerce granted NTSF by-product offsets for fish fat, skin, broken meat, and head and bone.[7] NTSF also sought by-product offsets for two further processed by-products – fish meal and fish oil – which were produced from the head and bone by-products. However, Commerce did not grant offsets for these further processed by-products, finding instead that it was more appropriate to grant an offset for the by-products used to produce them, *i.e.*, head and bone, because NTSF sold the head and bone to an unaffiliated company.[8]

---

[2] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 FR 48051 (October 16, 2017).
[3] *See* Memorandum, "Fourteenth Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Selection of Respondents for Individual Review," dated November 16, 2017.
[4] *See* Memorandum, "Fourteenth Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: 2nd Replacement Selection of Respondent for Individual Review," dated February 7, 2018. Commerce also selected the Hung Vuong Group as a replacement mandatory respondent on January 5, 2018. *See also* Memorandum, "Fourteenth Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Second Selection of Respondent for Individual Review," dated January 5, 2018.
[5] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments and Partial Rescission of the Antidumping Duty Administrative Review; 2016–2017*, 83 FR 46479 (September 13, 2018) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[6] *See Preliminary Results*, 83 FR at 46480; *see also* Memorandum, "14th Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results Analysis Memorandum for the NTSF Seafoods Joint Stock Company," dated September 4, 2018 (Preliminary Results Analysis Memorandum).
[7] *See* Preliminary Results Analysis Memorandum at 4.
[8] *Id*.

On April 29, 2019, Commerce published its *Final Results*.[9] In the *Final Results*, with regard to NTSF's reported fish meal and fish oil by-products, Commerce stated:

> NTSF reported that it produces broken meat, fish fat, and head and bone by-products. Near the end of the POR (May 2017), NTSF used its head and bone by-products to produce fish oil and fish meal.[10] NTSF reported that it **sold its head and bone by-product to another unaffiliated company** that produced fish oil and fish meal.[11] In other words, NTSF does not produce any fish oil or fish meal.
>
> Commerce's practice is to grant the respondents an offset to {normal value} for by-products generated during the production of the merchandise under consideration if evidence is provided that such by-product has commercial value.[12] Because NTSF **sells its fish head and bone** to a company that produces fish oil and fish meal, we have only granted a by-product offset for the fish head and bone NTSF sold, and not the downstream products produced by the unaffiliated processor.[13]

Thus, Commerce denied NTSF's reported fish meal and fish oil by-products based on NTSF's statements that it "sold" the head and bone product to an unaffiliated processor.[14] Given Commerce's understanding that NTSF sold the head and bone product to the processor, we determined that NTSF must necessarily have purchased back the downstream by-products (*i.e.*, fish meal and oil) from the processor and then resold it. As a result, Commerce only granted a by-product offset for the fish head and bone product sold by NTSF, and not the downstream fish oil and fish meal produced by the unaffiliated processor.[15]

---

[9] *See generally Final Results* IDM.
[10] *Id.* at Comment 11 (citing NTSF's Letter, "Section D Questionnaire Response and Section D Appendix Response," dated January 18, 2018 (NTSF January 18, 2018 DQR) at 16).
[11] *Id.* (emphasis added) (citing NTSF's Letter, "NTSF's Response to the Department's Supplemental Sections C and D Questionnaire," dated May 15, 2018 (NTSF May 15, 2018 SCDQR) at 40).
[12] *Id.* (citing *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 35245 (June 12, 2013), and accompanying IDM at Comment 10; and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and Partial Rescission of Antidumping Duty Administrative Review; 2013-2014*, 81 FR 17435 (March 29, 2016),and accompanying IDM at Comment XIV.a).
[13] *Id.* (emphasis added).
[14] *Id.* (citing NTSF May 15, 2018 SCDQR at 40).
[15] *Id.*

On December 21, 2020, the Court issued its *Remand Order*.[16] The *Remand Order* addressed whether three aspects of the *Final Results* were supported by substantial evidence: (1) Commerce's selection of financial statements for its calculation of surrogate financial ratios; (2) Commerce's calculation of surrogate values (SVs) for NTSF's fingerlings; and (3) Commerce's denial of by-product offsets for fish meal and fish oil. The Court affirmed Commerce's *Final Results* with respect to issues 1 and 2. With respect to issue 3, the Court concluded that Commerce's denial of by-product offsets for fish meal and fish oil was unsupported by substantial evidence in light of potentially contradictory record evidence and viewing the record as a whole.[17] Thus, the Court remanded Commerce "to explain its analysis of the record evidence cited by NTSF or otherwise change its determination."[18]

## III. ANALYSIS

Pursuant to the *Remand Order*, Commerce has reevaluated its treatment of NTSF's by-product claims for fish meal and fish oil. For the reasons stated below, we find that the record supports granting NTSF the claimed by-product offsets for fish meal and fish oil for the last three months of the POR.

During the POR, NTSF generated various by-products, including the fish head and bone produced as part of the filleting process. NTSF sold these unprocessed by-products during the first nine months of the POR, and Commerce granted the company by-product offsets for them.[19]

NTSF reported that, in the last three months of the POR, it had the head and bone further processed into fish meal and fish oil by an unaffiliated processor. As explained above, in the *Final Results*, we did not grant by-product offsets for fish meal and fish oil because information

---

[16] *See generally Remand Order*.
[17] *Id.* at 1-16.
[18] *Id.* at 16-19.
[19] *See* Preliminary Results Analysis Memorandum at 4.

4

on the record (statements by NTSF) indicated that NTSF "sold" the head and bone to the processor. As a result, we instead granted an offset for the head and bone used by the unaffiliated processor to produce the fish meal and oil.

After further review, we find that information on the record, when taken together, supports NTSF's assertion that it did not, in fact, sell fish head and bones during the last three months of the POR. Rather, the record indicates that NTSF transferred the head and bones to an unaffiliated toller for further processing, and it retained ownership of the input (head and bone) and the downstream products (fish meal and fish oil).

In making this determination, we recognize that there are conflicting statements on the record. In certain instances NTSF notes that it "sold" the head and bone to the processor;[20] in others, NTSF characterizes the transactions as an arrangement with an unaffiliated "toller."[21] When viewing the record as a whole, however, we find that the relationship was a tolling arrangement.

Sales records and reconciliations indicate that NTSF did not, in fact, sell the head and bone product to the unaffiliated processor in the last three months of the POR. There is no indication on the record that NTSF ever relinquished title to the head and bone, or to the resulting fish meal and oil, during the tolling process. Further, the record does not demonstrate that NTSF purchased the fish meal and oil from the toller. In addition, information on the record indicates that NTSF provided a tolling fee to the unaffiliated toller, pursuant to a toll production

---

[20] *See* NTSF May 15, 2018 SCDQR at 37 ("NTSF in turn **sells** to unaffiliated companies that process the by-product into fish meal and fish oil) and 40 ("All of the head and bone **sold** to the fish oil and fish meal toller is used to produce fish oil and fish meal" (same response twice).
[21] *Id.* at 40 and 43.

5

contract.[22] These facts are consistent with NTSF's assertion that the production of fish meal and oil was pursuant to a tolling contract.

Additional evidence further confirms that NTSF's by-product sales related to the downstream by-products. NTSF sold the toll-produced fish meal and fish oil during the last three months of the POR and did not sell the fish head/bone.[23] As such, we find that the record contains sufficient evidence to grant NTSF fish meal and fish oil by-product offsets for the last three months of the POR.

For the reasons stated, we adjusted NTSF's margin calculation to reflect fish meal and fish oil by-product offsets for the last three months of the POR, instead of offsets for the input head/bone during that period.[24] In calculating the revised margin, we relied on SVs from Indonesia, as it was the primary surrogate country in the underlying review. We deducted the factors of production (FOPs) (*i.e.*, labor, electricity, and rice husk) needed to process the head and bone into fish meal and fish oil.[25]

## IV. COMMENTS ON THE DRAFT RESULTS OF REDETERMINATION

Commerce released the Draft Results on January 29, 2021.[26] The petitioners[27] and NTSF submitted comments on February 17, 2021.[28]

---

[22] *See* NTSF May 15, 2018 SCDQR at Exhibit 47.
[23] *Id*. at Exhibit 44.
[24] *See* Memorandum, "Antidumping Duty Administrative Review of Frozen Fish Fillets January 29, 2021.
[25] *Id*. As noted below, we have modified our by-product SV adjustment from the Draft Results.
[26] *See* Draft Results of Redetermination Pursuant to Court Remand, *NTSF Seafoods Joint Stock Company and Vinh Quang Fisheries Corporation v. United States*, Court No. 19-00063, Slip Op. 20-180 (CIT December 21, 2020), dated January 29, 2021 (Draft Results).
[27] The petitioners are: Catfish Farmers of America and individual U.S. catfish processors including America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.
[28] *See* Petitioners' Letter, "Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: CFA's Comments on Commerce's Draft Remand Results," dated February 17, 2021 (Petitioners Comments); and NTSF's Letter, "Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Comments on Draft Results of Remand Redetermination, NTSF Seafoods Joint Stock Company and Vinh Quang Fisheries Corporation v. United States, Court No. 19-00063, Slip. Op. 20-180 (CIT December 21, 2020)," dated February 17, 2021 (NTSF Comments).

6

*The Petitioners' Comments*

*By-Product Reconciliation*[29]

- According to Commerce practice, a respondent must reconcile two sets of data to qualify for a by-product offset; it must demonstrate: (1) that its production process generated a certain amount of by-product; and (2) that same amount of by-product was sold or reincorporated into the production process.

- Regarding the first prong, NTSF did not demonstrate that its production process generated the reported quantity of head and bone sold/transferred. Specifically, the amount of by-product allegedly generated does not reconcile to NTSF's sales and transfer of head and bone. In addition, although NTSF provided a by-product sales reconciliation, it did not submit documentation substantiating the quantities of by-products generated. Hence, NTSF failed to satisfy the first required prong to qualify for a by-product offset.

- Regarding the second prong, NTSF failed to demonstrate that the amount of fish meal and fish oil it received from the toller was only from NTSF-provided head and bone, as the toller also produced fish meal and fish oil from other sources.

- Even if NTSF's reported data were reconcilable, the data are not credible because the record indicates very similar by-product to fish meal and fish oil generation rates by the toller for NTSF's materials, while the toller's production of non-NTSF product show noticeably different and varying by-product to fish meal and fish oil generation rates. Thus, the record demonstrates that NTSF's head and bone inputs and fish meal and oil outputs are not reliable.

---

[29] *See* Petitioners Comments at 2-8.

- For the reasons discussed above, NTSF's fish meal and fish oil by-product claims should be rejected.

*Fish Meal and Fish Oil SVs*[30]

- If Commerce continues to find NTSF's fish meal and fish oil by-product data useable, Commerce should not rely on import data to value the fish meal and fish oil by-products because those data are unreasonable. In aquaculture cases, Commerce has determined repeatedly that import data are not appropriate SVs sources for certain by-products because they are generally not internationally-traded commodities which would be reflected in import statistics.

- The proposed import data are not specific to *pangasius* fish by-products (let alone *pangasius hypophthalmus* by-products) but are "basket" categories covering fish oil and fish meal more generally. Additionally, the values cover exports from countries with no known production of *pangasius* or *pangasius hypophthalmus*, indicating that the corresponding average unit values necessarily contain non-*pangasius* import data.

- In light of the discussion above, Commerce should value any fish meal and fish oil by-products using the domestic price quotes on the record from various Indonesian sources, as it has in the past. These sources represent a broad-market average of contemporaneous fish meal and fish oil prices which are specific to NTSF's claimed fish meal and fish oil by-products, are publicly available, and are tax and duty exclusive. Furthermore, these pricing data are accompanied by sworn affidavits detailing the manner in which they were obtained, demonstrating their reliability.

---

[30] *Id*. at 8-10.

*NTSF's Comments*[31]

*SV Deductions*

- Commerce's Draft Results comply with the Court's order by granting NTSF the claimed by-product offsets for fish meal and fish oil. However, Commerce's deduction for movement expenses (international freight, marine insurance, brokerage and handling, and trucking) from the cost, insurance, and freight (CIF) import statistic SV for fish meal and fish oil lacks any support in law, practice, or the record.

- *Policy Bulletin 10.2*[32] and Commerce's practice[33] make clear that, where import prices are used to determine normal value in non-market economy cases, and those import prices are not expressed on a CIF basis, Commerce will add SVs for international freight and foreign brokerage and handling charges. The Indonesia GTA data used here were already expressed on a CIF basis; thus, Commerce erroneously deducted amounts for international freight, marine insurance, and brokerage and handling for the fish meal and fish oil components of normal value.

- Commerce did not cite any support for its deviation from this practice with respect the valuation of by-products using import statistics. Thus, by deducting these three expenses from the CIF value, Commerce directly contradicted its practice as described in *Policy Bulletin 10.2*.

- In this review, Commerce selected Indonesia as the surrogate country from which to base the SVs. With the unaltered CIF import values into Indonesia, Commerce already

---

[31] *See* NTSF Comments at 2-6.
[32] *Id*. (citing Import Administration Policy Bulletin Number 10.2, "Inclusion of International Freight Costs When Imported Prices Constitute Normal Value," (Nov. 1, 2010) (*Policy Bulletin 10.2*))
[33] *See, e.g., id*. (citing *Final Affirmative Determination of Sales at Less-Than-Fair-Value for Certain Glass Containers from the People's Republic of China*, 85 FR 58333 (Sep. 18, 2020), and accompanying IDM at Comment 2).

9

expressed the price of fish meal and fish oil in Indonesia, the surrogate country selected. Those CIF prices express the price at the border in Indonesia, but by subtracting international freight and marine insurance, Commerce expressed the price at the port of exporting country. Thus, with these adjustments, the price is no longer a price in the surrogate country, in contravention of the statute. Moreover, the subtractions from the CIF import price for brokerage and handling and trucking further distance the value from its proper expression as an Indonesian value in the surrogate country.

- Furthermore, Commerce's practice when using import statistics to value FOPs is to add an amount for the freight expense -- not subtract them as Commerce did in the Remand Results.

- For all of the reasons addressed above, Commerce should recalculate NTSF's antidumping margin by valuing fish meal and fish oil SVs without the deductions Commerce made.

**Commerce's Position:** For the reasons stated below, we continue to provide a by-product offset to NTSF for fish meal and fish oil. First, we find that NTSF did not fail to reconcile its by-product reporting and, accordingly, we find that a fish meal and fish oil by-product offset is warranted. Second, we find that Commerce's selection of the fish meal and fish oil SVs relied on in the Draft Results was appropriate and consistent with prior segments in this proceeding. Finally, we agree that, pursuant to Commerce's past practice, Commerce should not make movement expenses deductions to the fish meal and fish oil SVs.

With respect to NTSF's by-product reporting, NTSF reported that it generated a certain amount of fish head and bone by-product during the POR.[34] Of this amount, NTSF reported that

---

[34] *See* NTSF January 18, 2018 DQR at Exhibit D-13. *See also* Petitioners Comments at 3.

it sold a portion[35] and transferred the remaining portion[36] to an unaffiliated toller for processing into fish meal and oil. The petitioners argue that a portion of the head/bone remains unaccounted for, and, thus, the figures do not reconcile.[37] However, this difference amounts to 0.036 percent of the total reported. We find such a miniscule discrepancy does not render NTSF's reconciliation invalid.

The petitioners also assert that, even if NTSF reconciled its by-product *sales*, it did not independently do so for its *transfers* to the toller, *i.e.*, for merchandise sent for processing into fish meal and oil. However, NTSF reported its production and sales of by-products, and its transfers of head and bone to the toller, in its original section D response.[38] In a supplemental questionnaire, Commerce notified NTSF of certain deficiencies and asked it to reconcile its sales of by-products with the by-products reported in its FOP database.[39] All of the documentation we requested was provided by NTSF.[40] We did not ask for a separate reconciliation of the head and bone transfers for the last three months of the POR. For these reasons, we find that NTSF adequately supported its claimed by-product generation.

We also disagree with the petitioners' argument that the toller's generation (input/output) ratio of NTSF head and bone is unreliable. The petitioners emphasize that the toller's input/output ratio for NTSF's fish meal and fish oil is very similar month-to-month when compared to the toller's generation ratio for non-NTSF product. NTSF's toller reported its monthly material input and output of fish meal and oil from all sources including NTSF.[41]

---

[35] *See* NTSF May 15, 2018 SCDQR at Exhibit Supp CD-44. *See also*, Petitioners' Comments at 3.
[36] *See* NTSF January 18, 2018 DQR at Exhibit D-13. *See also*, Petitioners' Comments at 3-4.
[37] *See* Petitioners' Comments at 4.
[38] *See* NTSF January 18, 2018 Section D Response at Exhibit D-13.
[39] *See e.g.*, Commerce's Letter, "Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Supplemental Questionnaire for NTSF Seafoods Joint Stock Company," dated April 18, 2018, at questions 54 and 55.
[40] *See* NTSF May 15, 2018 SCDQR.
[41] *See* NTSF January 18, 2018 DQR at Exhibit D-13. This worksheet contains the input from all sources and the

11

Although NTSF reported that head and bone were used as the input for its fish meal and fish oil, it is not known what inputs, beyond head and bone, were used for non-NTSF product as the worksheet simply has "Materials" for the inputs. Furthermore, even though NTSF reported in its tolling contract the output specifications the toller should follow, which included specific additives in specific amounts,[42] it is not known what the output specifications were for the non-NTSF products. Thus, given the above, a meaningful in/out comparison is not possible between NTSF and non-NTSF product; nor did we ask NTSF to provide input/out ratios from its toller on a customer-specific basis. Thus, we find that the non-NTSF in/out experience does not have probative value as a benchmark in this instance.

Finally, while the petitioners note the similarity of the toller's monthly generation ratios for NTSF, they do not point to any record evidence that demonstrates these ratios are anomalous, apart from comparing them to the non-NTSF products (which are not necessarily comparable, for the reasons noted above). We decline to discount NTSF's reporting with respect to its toller on the basis of such speculation. Give the totality of the aforementioned facts, we find that NTSF did not fail to adequately support its by-product reporting.

With respect to Commerce's selection of fish meal and fish oil SVs, we continue to find that the GTA data provide an appropriate source to value fish meal and fish oil, and find that they are superior to the alternative data, *i.e.*, Indonesian price quotes. Section 773(c)(1) of the Act instructs Commerce to value FOPs with the best available information from a market economy country, or countries that Commerce considers appropriate. When considering what constitutes the best available information, Commerce considers several criteria, including

---

output of fish oil and the output of fish meal separately. Thus, this worksheet has one input "Materials" to two outputs "Fish meal" and "Fish oil."
[42] *See* NTSF May 15, 2018 SCDQR at Exhibit 47.

whether the SV data are contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average, and specific to the inputs in question.[43] Commerce's preference is to satisfy the breadth of the aforementioned selection criteria.[44] Moreover, it is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis of valuing FOPs.[45] Commerce must weigh the available information with respect to each input value and make a product-specific and case-specific decision as to what constitutes the best available SV for each input.[46]

In the Draft Results, Commerce valued fish meal using contemporaneous Indonesian GTA import data under harmonized tariff schedule (HTS) heading 2301.20.20 "Flours, meals and pellets, of fish, with a protein content of 60% or more by weight."[47] With regard to fish oil, we valued this by-product using contemporaneous Indonesian GTA import data under HTS heading 1504.20.90 "Fats and oils and their fractions, of fish, other than liver oils: Other."[48] The petitioners assert that Commerce should use Indonesian price quotes for *pangasius* fish meal and fish oil that it obtained.[49] We do not find that these data satisfy more of the criteria listed above.

---

[43] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079 (September 8, 2006) and accompanying IDM at Comment 3.
[44] *See, e.g., Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 76 FR 51940, 51943 (August 19, 2011) and accompanying IDM at Comment 2.
[45] *See Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006) (*Mushrooms from China*) and accompanying IDM at Comment 1; and *Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review*, 67 FR 19546 (April 22, 2002) and accompanying IDM at Comment 2.
[46] *See, e.g., Mushrooms from China* IDM at Comment 1.
[47] *See* Draft Remand Analysis Memorandum at 2 (citing NTSF's Letter, "Frozen Fish Fillets from Vietnam: Response to Request for Surrogate Value Information," dated March 22, 2018). For the corresponding HTS description, *see* Petitioners' Letter, "Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Petitioners' Rebuttal Surrogate Value Information," dated March 29, 2018, at Exhibit 10.
[48] *Id.*
[49] *See* Petitioners' Letter, "Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Petitioners' Submission of Proposed Factor Values," dated March 22, 2018, at Exhibit I-8A and I-8B.

With respect to taxes and duties, the GTA data are tax and duty exclusive. We also find that the price quotes are tax and duty exclusive.

Regarding whether the SV data are contemporaneous, we find that the GTA data are contemporaneous with the 12 months of the POR. The price quotes are for calendar years 2016 and 2017 and, thus, we find them also to be contemporaneous. However, we note that these price quotes include prices for 12 months outside the POR.

Regarding public availability, we find that GTA data are publicly available as they are published online and widely accessible. Regarding the price quotes, Commerce's stated preference is to rely on publicly-available broad market average price data rather than on price quotes obtained by interested parties, because price quotes obtained by interested parties are subject to information collection and accessibility concerns. For example, Commerce has concerns about relying on price quotes obtained by interested parties in an antidumping proceeding because, in order to obtain this information, an interested party may need to conduct private correspondence with the information source and this action calls into question the public availability of the data.

Regarding whether the SV data are representative of a broad market average, we find that the GTA data satisfy this criterion as they are national statistics of imports from around the world. With regard to the handful of price quotes provided, we find that they are not representative of a broad market average like the GTA data.

Regarding whether the SV data are specific to the inputs in question, the petitioners claim that the price quotes are more specific because they are *pangasius*-based fish meal and oil price quotes. However, while Commerce has found specificity with regard to species crucial with respect to the whole fish input (*i.e.*, species is a control number physical characteristic), we note

14

that fish meal and fish oil are not inputs but, rather, outputs. Moreover, the petitioners do not provide any evidence that input species is a determining factor in the selling and or buying of fish meal or fish oil. Furthermore, the price quotes do not list the protein content, which is a determining factor in the valuation of fish meal. In contrast, while the GTA data are not specific to the species, fish meal is specific with regard to protein content, as the HTS category for "Flours, meals and pellets, of fish, with a protein content of 60% or more by weight" matches the protein content and experience of NTSF during the POR, and NTSF's fish oil is an "oil" of "fish" with a very high protein content.[50]

In addition, while GTA data represent national statistics from a government source, the petitioners' price quotes are based on a limited number of affidavits obtained for the sole purpose of the administrative review. While we have used information from affidavits where necessary, in this review there are alternate data from a neutral (government) source in the primary surrogate country that meet all of the SV selection criteria.

In their comments on the Draft Results, the petitioners argue that by-products from aquaculture production are not internationally traded, and, thus, international trade data do not provide an appropriate SV source. However, it is beyond dispute that fish meal and fish oil are by-products, and they are traded internationally given that they appear in the GTA data; thus, the petitioners' argument is without merit. Moreover, we note that Commerce relied on import data (under the same HTS headings relied on for the Draft Results), in the prior past (five) segments to value fish meal and fish oil by-products.[51]

---

[50] *See* NTSF May 15, 2018 SCDQR at Exhibit 47.
[51] *See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Sixth Antidumping Duty Administrative Review and Sixth New Shipper Review*, 76 FR 15941 (March 22, 2011), and accompanying IDM; *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results and Partial Rescission of the Seventh Antidumping Duty Administrative Review*, 77 FR 15039 (March 14, 2012), and accompanying IDM;

Thus, given the above analysis, and consistent with our past practice, we find that the Indonesian GTA data on the record are superior to the petitioners' proffered alternative and offer the best SV information available to value fish meal and fish oil. Accordingly, we will continue to use these data for these final results of redetermination.

Finally, consistent with Commerce's past practice,[52] we are no longer making movement expense deductions to the fish meal and fish oil SVs. Accordingly, Commerce is removing these deductions (*i.e.*, international freight, marine insurance, brokerage and handling and trucking expenses) from the fish meal and fish oil SVs.[53]

## V. FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's remand order and interested parties' comments, and in light of the record evidence as a whole, Commerce is revisiting the *Final Results* and is granting NTSF by-product offsets for fish meal and fish oil. In addition, in a change from the Draft Results, we are no longer making an adjustment for movement expenses to the fish meal and fish oil SVs. As a result, we have computed a revised dumping margin of $1.28 per kilogram for NTSF.[54]

In the *Final Results*, Commerce assigned a dumping margin to the companies in the review that it did not individually examine, but which demonstrated their eligibility for separate

---

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews; 2010-2011*, 78 FR 17350 (March 21, 2013), and accompanying IDM; *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2011-2012*, 79 FR 19053 (April 7, 2014), and accompanying IDM; and, *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of no Shipments, and Partial Rescission of the Antidumping Duty Administrative Review; 2018–2019*, FR 85 84300 (December 28, 2020), and accompanying PDM.
[52] *See e.g.*, *Certain Aluminum Foil from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2017-2019*, 86 FR 11499 (February 25, 2021), and accompanying IDM.
[53] *See* Memorandum, "Antidumping Duty Administrative Review of Frozen Fish Fillets from Vietnam: Final Remand Margin Calculation for NTSF Seafoods Joint Stock Company," dated concurrently with these final results (Final Remand Analysis Memorandum).
[54] *Id*.

16

rates, based on NTSF's dumping margin.[55]  Consistent with this approach, we have assigned a dumping margin to the separate rate respondent that is a party to the litigation, based on the dumping margin of NTSF.  The revised rate applicable to the separate rate respondent, Vinh Quang Fisheries Corporation, who is a party to this remand, will be adjusted accordingly.[56]

Should the Court affirm these final results of redetermination, Commerce intends to publish a notice of amended final determination and issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

3/22/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance

---

[55] *See Final Results*, 84 FR at 18008.
[56] It is Commerce's practice to adjust the separate rate for those parties who participated in the underlying litigation. Only separate rate company, Vinh Quang Fisheries Corporation, participated in the underlying litigation and requested reassignment of its separate rate based on any changes made to NTSF's dumping margin.  *See* CIT No. 19-00063 at 2.  Accordingly, the redetermined separate rate, based on the recalculated dumping margin of NTSF, will apply to Vinh Quang Fisheries Corporation.

17