|  |  |
|---|---|
| NTSF SEAFOODS JOINT STOCK COMPANY and VINH QUANG FISHERIES CORPORATION,<br><br>  Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>  Defendant,<br><br>  and<br><br>CATFISH FARMERS OF AMERICA, *ET AL.*,<br><br>  Defendant-Intervenors. | Court No. 19-00063<br><br>**PUBLIC VERSION**<br><br>Business Proprietary Information Removed from Brackets on Pages 4-10. |

### DEFENDANT-INTERVENORS' COMMENTS IN OPPOSITION TO REMAND RESULTS

Defendant-Intervenors, the Catfish Farmers of America, *et al.* (together, "CFA"), hereby submit these comments in opposition to the Final Results of Redetermination Pursuant to Court Remand (Mar. 23, 2021) ("*Remand Results*") (ECF No. 78) issued by the U.S. Department of Commerce ("Commerce") in response to this Court's ruling in *NTSF Seafoods Joint Stock Company et al. v. United States*, Court No. 19-00063, Slip Op. 20-180 (Ct. Int'l Trade Dec. 21, 2020) ("Slip Op. 20-180") (ECF No. 74).[1]

---

[1] This action arises from Commerce's determination in *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results, and Final Results of No Shipments of the Antidumping Duty Administrative Review; 2016–2017*, 84 Fed. Reg. 18,007 (Dep't of Commerce Apr. 29, 2019), and accompanying unpublished Issues and Decision Memorandum ("Final IDM"), P.R. 547. Citations to documents on the confidential and public administrative records of the underlying review are in the form of "C.R.__" and "P.R.__," respectively. Citations to the confidential and public record of Commerce's remand redetermination are in the form "C.R. REM__" and "P.R. REM__," respectively.

This Court sustained, in part, and remanded, in part, certain aspects of the *Final Results*. Slip-Op 20-180 at 19. In particular, the Court remanded Commerce's denial of NTSF Seafoods Joint Stock Company's ("NTSF's") by-product offsets for fish meal and fish oil for further consideration because the record contained potentially contradictory evidence as to whether these by-products were produced through a tolling agreement. *Id*. at 18. In its *Remand Results*, Commerce determined that the fish meal and fish oil by-products were produced for NTSF by an unaffiliated toll processor. *Remand Results* at 1. Based solely on this revised finding, Commerce granted NTSF's requested offsets despite NTSF's failure to substantiate the quantity of by-product that it and its toll processor allegedly produced from merchandise under consideration ("MUC") during the period of review ("POR"). *Id*. at 1, 5-6 ("For the reasons discussed below, we find that NTSF's fish meal and fish oil by-products were produced pursuant to a tolling arrangement with an unaffiliated processor and later sold to unaffiliated purchasers. Accordingly, we now find that NTSF's requested by-product offsets for sales of fish meal and fish oil are warranted.").

As explained below, Commerce's *Remand Results* are not supported by the record and are not in accordance with the law because Commerce, without explanation, departed from its established practice of denying a respondent's by-product offset where it fails to substantiate by-product production. Commerce's *Remand Results* are also in error because Commerce used unreasonable surrogates to value NTSF's fish meal and oil by-product offsets. For these reasons, the Court should remand its redetermination to Commerce for further consideration.

I. **COMMERCE'S DETERMINATION TO GRANT NTSF A BY-PRODUTCT OFFSET IS NOT SUPPORTED BY THE RECORD OR COMMERCE'S PRACTICE**

Commerce may make adjustments "to export price, constructed export price, or normal value," so long as "{t}he interested party that is in possession of the relevant information {establishes}…the amount and nature of a particular adjustment." 19 C.F.R. § 351.401(b); *see also Mid Continent Nail Corporation v. United States*, 34 C.I.T. 498, *510-*511, Ct. No. 08-224, Slip Op. 2010-47 (Ct. Int'l Trade 2010) ("*Mid Continent Nail Corp.*"). In the case of by-product adjustments, Commerce requires that "a respondent must first provide and substantiate the quantity of by-product it produced from subject merchandise {during the period of review}." *See Wooden Bedroom Furniture from the People's Republic of China*, 73 Fed. Reg. 49,162 (Dep't of Commerce Aug. 20, 2008) (fin. res. admin. rev.) and accompanying unpublished Issues and Decision Memorandum ("*Wooden Bedroom Furniture IDM*") at Comment 20. As Commerce has explained, "{t}he reason for this practice is that {Commerce} must determine whether the respondent's production process for subject merchandise <u>actually generated</u> the amount of scrap claimed as a by-product offset." *Id.*; *Mid Continent Nail Corp.*, 34 CIT at *510-*511 (emphasis added).

In simple terms, a respondent must reconcile the amount of scrap (in this case, fish head and bone) generated to the amount of by-product (in this case, fish meal and fish oil) sold. *See Wooden Bedroom Furniture IDM* at Comment 20; *Mid Continent Nail Corp.*, 34 CIT at *510-*511. Without that reconciliation, Commerce cannot determine whether the by-product sold was produced from the scrap generated or was instead produced using additional scrap or scrap produced from another source, both of which would artificially inflate the respondent's offset.

This fundamental requirement does not disappear when a respondent uses a toller to produce the by-product. Indeed, as Commerce noted, the principal feature of a tolling

relationship is that the original manufacturer, here NTSF, "retain{s} ownership of the input (head and bone) and the downstream products (fish meal and fish oil)." *Remand Results* at 5; *see also* Slip-Op 20-180 at 18 (quoting Toll Manufacturing, Black's Law Dictionary (11th ed. 2019) (noting that in a tolling arrangement "'{t}he same party owns both the input and the output of the manufacturing process'"). Consequently, NTSF must demonstrate both (a) that its production of MUC generated the [        ] of fish head and bone by-product that it claims it transferred to the unaffiliated toller for processing, and (b) that the [        ] of fish head and bone it provided to the toller resulted in the [        ] of fish meal and oil by-product that it received back from the toller and subsequently sold.

In the *Remand Results*, Commerce granted NTSF a by-product offset based solely on its revised finding that NTSF "transferred {rather than sold} head and bones to an unaffiliated toller for further processing, and it retained ownership of the input (head and bone) and the downstream products (fish meal and fish oil)." *Remand Results* at 5. However, this finding is an insufficient basis on which to grant a by-product offset because NTSF failed to reconcile the amount of fish head and bone that it sent to its unaffiliated toller with the amount of fish meal and oil it received back and subsequently sold. Indeed, the record indicates that the values NTSF reported to Commerce are unreliable. Therefore, Commerce's decision to grant NTSF a by-product offset is not supported by the record and is contrary to its practice.

### A. Contrary to its Finding in the *Remand Results*, Commerce Requested Several Times that NTSF Reconcile Its Fish Head and Bone By-Product Inputs and Fish Meal and Oil By-Product Outputs

Commerce does not dispute its practice of requiring reconciliation between the amount of scrap (*i.e.*, fish head and bone) produced and the amount of downstream by-product sold. Instead, it argues incorrectly that NTSF "adequately supported its claimed by-product generation" because Commerce only required NTSF to reconcile its by-product *sales* and that it did not require NTSF

4

to separately reconcile its head and bone transfers. *Remand Results* at 11. Commerce's explanation contradicts the record and fails to justify its departure from practice.

*First*, Commerce's original questionnaire required NTSF to provide production records demonstrating that the head and bone transferred for the largest month of consumption were used to produce the reported fish meal and oil by-products. Commerce Antidumping NME Questionnaire (Nov. 21, 2017) ("Commerce Original Questionnaire"), P.R. 58, at D-10 ("If reintroduced into production, provide production records demonstrating this for the largest month of consumption for each by-product/co-product"). NTSF failed to provide the requested production records and reconciliation in its initial Section D Response. NTSF Section D Response (Jan. 18, 2018), C.R. 92, at D-16, Exhibit D-13.

*Second*, NTSF was required to submit a reconciliation of its factors of production reporting (including by-products) in response to Appendix V of Commerce's original questionnaire. Commerce Original Questionnaire, P.R. 58, at Appendix V. Commerce specifically requested that NTSF provide "both the quantity and value" of its reported factors of production reporting (including by-products). *Id*. at V-2. NTSF failed to provide the requested reconciliations for its by-product production and/or sales. NTSF Jan. 18th Section D Response, C.R. 92, at Exhibit D-16.

*Third*, NTSF was required to submit a detailed material balance, "reconciling" the volumes of "each type of self-generated by-product produced" and "each individual type of by-product sold" as reported in Exhibit D-13 of NTSF's Jan. 18th Section D Response. Commerce Supplemental Questionnaire (Apr. 18, 2018), P.R. 358, at 13-14 (emphasis added). In other words, NTSF was required to reconcile the head and bone transfer volumes to the fish meal and oil outputs. NTSF failed to do so. Instead, NTSF reconciled [

5

]. NTSF Supplemental Response (May 15, 2018), C.R. 190, at Exhibit Supp CD-44.

As shown, Commerce's original questioning was consistent with its practice because it required NTSF to separately reconcile its head and bone transfers to its toller, to the fish meal and oil received from that toller. Therefore, Commerce's explanation that it never asked for such reconciliation is not supported by the record.

### B. NTSF Failed to Demonstrate that Its POR Production of MUC Generated [     ] of Fish Head and Bone

As explained above, to substantiate its claimed [     ] offset for fish meal and fish oil by-product, Commerce required that NTSF first substantiate that its production of MUC during the POR generated the [     ] of fish head and bone by-product that it claims to have transferred to the unaffiliated toller for processing. NTSF Jan. 18th Section D Response, C.R. 92, at Exhibit D-13. NTSF failed to satisfy this requirement and did not deny that the total inputs and total outputs it submitted to Commerce did not balance. NTSF May 15th Supplemental Response, C.R. 179, at Supp CD-37 (attributing unreconcilable amounts to soaking).

*First*, although NTSF submitted documentation to reconcile its by-product *sales*, it did not provide a similar reconciliation for the total quantity of by-product that it purportedly generated or for the amount it claims to have transferred to its toller. Again, NTSF reported total inputs and total outputs that do not reconcile. NTSF May 15th Supplemental Response, C.R. 179, at Supp CD-37. NTSF thus failed to demonstrate that its production process for MUC in fact generated the [     ] of fish head and bone that it claims to have transferred to its toller for processing.

In the *Remand Results*, Commerce acknowledged that NTSF failed to provide a reconciliation of the fish head and bone it allegedly provided to its toller. *Remand Results* at 11. However, as noted above, Commerce concluded that this deficiency was acceptable because it

6

"did not ask {NTSF} for a separate reconciliation of the head and bone transfers for the last three months of the POR." *Id*. Such a determination is contrary to the record demonstrating that Commerce did ask for that reconciliation, is contrary to Commerce's practice, and is contrary to Commerce's own regulations, which place the burden of substantiating the quantity of by-product produced on the respondent. *Wooden Bedroom Furniture IDM* at Comment 20; *see also Mid-Continent Nail Corp*, 34 CIT at *510-*511.

*Second*, NTSF failed to reconcile the amounts of fish head and bone by-product it claims to have generated during the POR (*i.e.*, [            ]) with the amounts of fish and bone by-product it claims to have sold (*i.e.*, [            ]) and transferred to the toller (*i.e.*, [            ]), which together sum to [            ]. NTSF Jan. 18th Section D Response, C.R. 92, at Exhibit D-13; NTSF May 15th Supplemental Response, C.R. 190, at Exhibit Supp CD-44. In the *Remand Results*, Commerce dismisses this [   ] difference as a "miniscule discrepancy" that amounts to only 0.036 percent of the total reported and which "does not render NTSF's reconciliation invalid."[2] *Remand Results* at 10-11. Commerce misses the point. The problem is that, because NTSF failed to provide a proper reconciliation of (a) the fish head and bone by-product inputs transferred to the unaffiliated toller, (b) the fish meal and fish oil by-product outputs processed by that toller (discussed below), and (c) its total inputs and outputs (including by-products), Commerce cannot know whether the difference is greater or less than [      ]. Thus, Commerce's dismissal of this discrepancy because it is "miniscule" is not supported by the record.

---

[2] [        ] (total generated) – [        ] (total sold) – [        ] (total transferred to toller) = [      ] difference.

7

### C. NTSF Also Failed to Demonstrate that the [          ] of Fish Head and Bone It Claims to Have Transferred to Its Toller Produced the [          ] of Fish Meal and Fish Oil By-Product For Which it Claims an Offset

NTSF also failed to substantiate that the [          ] of fish head and bone it claims to have provided to its toller actually produced the [          ] of fish meal and fish oil for which it claims a by-product offset. *See* NTSF Jan. 18th Section D Response, C.R. 92, at Exhibit D-13; NTSF May 15th Supplemental Response, C.R. 192, at Exhibit Supp CD-48; *see also Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China*, 78 Fed. Reg. 35,245 (Dep't of Commerce June 12, 2013) (fin. res. admin. rev.), and accompanying Issues and Decision Memorandum ("*PET Film IDM*") at Issue 10 (noting that Commerce practice requires a respondent "to provide and substantiate the quantity of by-products it generated from the production of subject merchandise during the POR"). Without such a reconciliation it is impossible to confirm whether, for example, the toller did not mix-in additional fish waste from other sources or that NTSF did not sell fish oil and meal produced entirely from another company's fish head and bone. Indeed, Commerce recognized in its *Remand Results* that "{a}lthough NTSF reported that head and bone were used as the input for its fish meal and fish oil, <u>it is not known what inputs, beyond head and bone, were used for non-NTSF product as the worksheet simply has 'Materials' for the inputs</u>." *Remand Results* at 12 (emphasis added).

The need for reconciliation of the toller's production is particularly important in this instance because that toller consumed [          ] head and bone inputs from sources other than NTSF and processed [          ] fish meal and oil than it processed for NTSF. In particular, NTSF reported that during the last three months of the POR its toller used [          ] of inputs to produce [          ] of fish meal and oil. NTSF May 15th Supplemental Response, C.R. 192, at Exhibit Supp CD-48. Of this NTSF [          ] making it impossible to verify from record

8

evidence any connection between the [         ] of fish head and bone input NTSF claims to have transferred to the toller and the [         ] of fish meal and oil that was later returned. *See* NTSF Jan. 18th Section D Response, C.R. 92, at Exhibit D-13.

In any event, NTSF's reporting is not credible. *First*, Commerce recognized that it is unclear how or why the head and bone inputs that NTSF provided to the toller generated [         ] fish meal and oil than the inputs coming from other sources. *Remand Results* at 12. For example, for every [         ] of fish head and bone provided by NTSF for each of the last 3 months of the POR, the toller generated [         ] of fish meal and oil by-product.[3] NTSF Jan. 18th Section D Response, C.R. 92, at Exhibit D-13. By contrast for each [         ] of inputs [         ] the toller generated [         ] of fish meal and oil, [         ].[4] NTSF Jan. 18th Section D Response, C.R. 92, at Exhibit D-13; NTSF May 15th Supplemental Response, C.R. 192, at Exhibit Supp CD-48.

*Second*, the data reported by NTSF reflect an [         ]. For example, in June and July, NTSF reported [         ] usage rates (*i.e.*, the amount of inputs used to produce one kilogram of output) [         ]. CFA Comments on Draft Remand Results, REM C.R. 5, at 7 (Table 3) (citing NTSF Jan. 18th Section D Response, C.R. 92, at Exhibit D-13). In May, the reported usage rate was [         ]. *Id*. It is simply not possible to produce by-products [         ]. Indeed,

---

[3] May: [         ]; June: [         ]; July: [         ].

[4] May: [         ]; June: [         ]; July: [         ].

9

a similar comparison of NTSF's toller's production for these months reflect [

] in May-July, respectively. *Id*. at 8 (Table 4) (*see also* NTSF May 15th Supplemental Response, C.R. 192, at Exhibit Supp CD-48). This usage rate analysis coupled with the prior analysis shows that NTSF either [

]. Either way, NTSF's reported fish meal and oil by-product offsets are not credible, and demonstrate why Commerce was wrong to grant NTSF a by-product offset.

In the *Remand Results*, Commerce dismissed these concerns as "speculation," noting that "the non-NTSF in/out experience does not have probative value as a benchmark" because "it is not known" what the input and output specifications are for non-NTSF products. *Remand Results* at 12. However, the reason such facts are "not known," *i.e.*, absent from the record, is because NTSF failed to provide them when Commerce requested them. Again, respondents are required to "provide and substantiate" the quantity of by-product produced from subject merchandise before Commerce will grant a by-product offset. *Wooden Bedroom Furniture IDM* at Comment 20. As explained above, NTSF did not provide the data necessary to substantiate its claimed by-product offset. Commerce's granting of a by-product offset in such circumstances is not supported by the record, is contrary to its practice, and is thus contrary to law.

### II. COMMERCE USED UNREASONABLE SURROGATES TO VALUE NTSF'S FISH MEAL AND OIL BY-PRODUCT OFFSETS

Even if Commerce's decision to grant NTSF by-product offsets for fish meal and oil were reasonable, Commerce's choice of surrogate values to calculate these offsets was not. In the *Remand Results*, Commerce relied on GTA import data to value these by-products despite Commerce routinely rejecting that source as a viable surrogate for aquaculture by-products because they "are generally not international traded commodities" and their use "would distort the

NV calculation." *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 78 Fed. Reg. 17,350 (Dep't of Commerce Mar. 21, 2013) (fin. res. admin. rev.) ("*2010-2011 Frozen Fish Fillets*"), IDM at Comment VII.A.; *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 79 Fed. Reg. 19,053 (Dep't of Commerce Apr. 7, 2014) (fin. res. admin. rev.), IDM at Comment X; *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 80 Fed. Reg. 2,394 (Dep't of Commerce Jan. 16, 2015) (fin. res. admin. rev.), IDM at Comment XIX; *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 81 Fed. Reg. 17,435 (Dep't of Commerce Mar. 29, 2016) (fin. res. admin. rev.), IDM at Comment XIV. In such instances, Commerce has explained that "specificity…{is} the most important factor in valuing this by-product" and accordingly used surrogate country price quotes as surrogate values. *2010-2011 Frozen Fish Fillets*, IDM at Comment VII.A

As in those cases, GTA import data in this instance is unreasonable because the record demonstrates that fish meal and oil by-products are not generally traded internationally and are not covered by a harmonized tariff code that is specific to *pangasius* fish. In particular, record evidence demonstrates that "the costs associated with importing pangasius by-products . . . normally exceed the prices that customers are willing to pay for the by-products in the marketplace," evidencing that there is generally little international trade of such products. CFA Rebuttal Surrogate Value Information (Mar. 29, 2018), P.R. 341-342, at Exhibit 1.[5] Furthermore, the import data that Commerce used are from "basket" tariff categories, that are not specific to *pangasius* fish (let alone *pangasius hypophthalmus* fish) and which primarily come from countries with no known production of *pangasius* (*e.g.*, Chile, Peru, Australia). *See* CFA Surrogate Country Selection Comments (Feb. 1, 2018), P.R. 201, at Exhibit I-4 (containing

---

[5] Although this evidence refers to trade in Indonesia, the premise for why such by-products are not imported into Indonesia applies universally.

11

world-wide pangasius fish production data obtained from the Food and Agriculture Organization of the United Nations which does not show these countries as producers of *pangasius* fish); CFA Submission of Factual Information (June 1, 2018), P.R. 389, at Exhibit 3, pg. 3 (specifying that *pangasius hypophthalmus* is primarily cultivated in Southeast Asia). As a result, the GTA import-based unit values that Commerce used necessarily contain mostly, if not only, non-*pangasius* fish oil and meal and are therefore unreasonable.

In the *Remand Results*, Commerce found that these arguments lack merit because there is no evidence that input species is a determining factor in the selling and/or buying of fish meal or oil by-products. *Remand Results* at 14-15. This is directly contradicted in the record. The Indonesia Ministry of Fisheries 2017 Report on "Unrefined Fish Oil in Indonesia" distinguishes between various types of unrefined fish oils produced in Indonesia including *pangasius* fish oil, sardine fish oil, mackerel fish oil, tilapia fish oil, and thunnus fish oil and indicates that the chemical profiles, uses, and prices of various oils differ. *See* NTSF Surrogate Value Submission (Mar. 22, 2018), P.R. 327, at Exhibit SV-13; s*ee also* CFA Mar. 29th Rebuttal Surrogate Value Information, P.R. 341-342, at Exhibit 1 ("Indonesian consumers generally prefer high quality fish oil that comes from marine species of fish, such as cod liver oil or sardine oil, rather than unrefined fish oil derived from freshwater species like pangasius. The higher Omega 3 and polyunsaturated fatty acid content of fish oil derived from marine species of fish causes this type of fish oil to be of a much higher quality and, consequently, sell at a higher price than unrefined pangasius fish oil in the marketplace"). Thus, Commerce's explanation is not supported by the record, which demonstrates that input species is indeed "a determining factor in the selling and/or buying of fish meal or oil." *See Remand Results* at 14-15.

Commerce's related finding that Indonesian GTA data are "superior to {CFA's} proffered alternative and offer the best SV information available to value fish meal and fish oil" was also

based on its unsupported conclusion that input species is not a determining factor in the price of fish meal and oil. However, the record shows that the average per-kg price of unrefined sardine oil is higher than the average per-kg price of unrefined *pangasius* fish oil. NTSF Mar. 22nd Surrogate Value Submission, P.R. 327, at Exhibit SV-13 (pp. 10-11). Thus, whether the input species is *pangasius* or *non-pangasius* does matter, and it matters that CFA's proffered Indonesian price quotes for *pangasius*-based fish meal and oil are more specific than the GTA import data, which are not differentiated by species. CFA provided Indonesian price quotes which reflect a broad Indonesian-market average as they were collected from a number of sources and accompanied by sworn affidavits attesting to their accuracy, tax and duty exclusive, and publicly available on the record of this proceeding. *See* CFA Comments on Draft Remand Results, REM P.R. 7, at 10. The Indonesian price-quotes thus satisfy all of Commerce's requirements and are the best available surrogate value fish meal and oil because, unlike GTA import data, they are specific to the *pangasius*-derived products produced by NTSF. *See Remand Results* at 12-13 ("When considering what constitutes the best available information, Commerce considers several criteria, including whether the SV data are contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average, and specific to the inputs in question."); *see also*, *e.g.*, *Certain Lined Paper Products from the People's Republic of China*, 71 Fed. Reg 53,079 (Dep't of Commerce Sept. 8, 2006) (fin. LTFV deter.), IDM at Comment 3. Commerce's conclusions are contrary to the record.

**III. CONCLUSION**

For the reasons set forth above, the Court should reject Commerce's *Remand Results* because Commerce's conclusions are not supported by the record and contradict Commerce's practice. Accordingly, we respectfully request that the Court further remand this issue to Commerce with instructions to redetermine its by-product offset decision in light of the record and its practice.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: May 11, 2021 | /s/ Jonathan M. Zielinski |
|  | Jonathan M. Zielinski<br>James R. Cannon, Jr.<br>Nicole Brunda<br>CASSIDY LEVY KENT (USA) LLP<br>900 19th Street, NW, Suite 400<br>Washington, DC 20006<br>(202) 787-5507<br>jzielinski@cassidylevy.com |
|  | *Counsel to Catfish Farmers of America, et al.* |

**Certificate of Compliance with Standard Chambers Procedure 2(B)(1)(b)**

The undersigned hereby certifies that the foregoing comments in opposition to Commerce's *Remand Results* contain 4,200 words, exclusive of any corporate disclosure statement, table of contents, table of authorities, certificates of counsel, and counsel's signature, and therefore complies with the maximum 10,000 word count limitation set forth in this Court's Standard Chambers Procedure 2(B)(1)(b).

BY:   /s/ Jonathan M. Zielinski
       Jonathan M. Zielinski