## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NTSF SEAFOODS JOINT STOCK COMPANY and VINH QUANG FISHERIES CORPORATION,<br><br>                              Plaintiffs,<br><br>               v.<br><br>UNITED STATES,<br><br>                              Defendant,<br><br>    and,<br><br>CATFISH FARMERS OF AMERICA, ET AL.,<br><br>                              Defendant-<br>                              Intervenors. | **Before:** Jennifer Choe-Groves, Judge<br><br>Ct. No. 19-00063<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Confidential information has been redacted at pages 10–11, and 13–15. |

## PLAINTIFFS' RESPONSE TO COMMENTS ON REMAND RESULTS OF DEFENDANT-INTERVENORS CATFISH FARMERS OF AMERICA, ET AL.

Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC  20003
(202) 223-3760
Counsel to Plaintiffs NTSF Seafoods Joint Stock
Company and Vinh Quang Fisheries Corporation

Dated: June 11, 2021

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

I.  INTRODUCTION ..................................................................................... 1

II. ARGUMENT ............................................................................................ 3

    A.  COMMERCE'S DETERMINATION TO GRANT NTSF A
        BYPRODUCT OFFSET FOR FISH OIL AND FISH MEAL SOLD
        DURING THE PERIOD OF REVIEW IS SUPPORTED BY
        SUBSTANTIAL EVIDENCE ........................................................ 4

        1.  Commerce's Practice Does Not Require A Complete Reconciliation of
            Head and Bone Inputs to Fish Meal and Oil Outputs ............................ 5

        2.  Commerce's Conclusion That NTSF Reliably Reported the Quantities
            of Fish Oil and Fish Meal Byproducts Produced and Sold During the
            Period of Review is Supported by Substantial Evidence ........................ 10

    B.  COMMERCE'S SELECTION OF INDONESIAN IMPORT DATA TO
        VALUE NTSF'S FISH OIL AND FISH MEAL BYPRODUCTS IS
        SUPPORTED BY SUBSTANTIAL EVIDENCE ...................................... 17

III. CONCLUSION ........................................................................................ 22

## TABLE OF AUTHORITIES

**Judicial Decisions**

*NTSF Seafoods Joint Stock Company and Vinh Quang Fisheries Corporation v. United States*, 44 CIT __, 487 F. Supp. 3d 1310 (2020) ............................................................2, 4

*Mid Continent Nail Corp. v. United States*, 34 CIT 498 (2010) ..........................................7

**Administrative Determinations**

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 84 Fed. Reg. 18,007 (Dep't Commerce Apr. 29, 2019) ................................................................................2

Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of the Fourteenth Antidumping Duty Administrative Review: 2016–2017" (Apr. 19, 2019) ....................................................................2, 4

*Wooden Bedroom Furniture from the People's Republic of China*, 73 Fed. Reg. 49,162 (Dep't Commerce Aug. 20, 2008), and accompanying Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review and New Shipper Review of Wooden Bedroom Furniture from the People's Republic of China, A-570-890, (Aug. 11, 2008) ....................................................................................................6

*Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China*, 78 Fed. Reg. 35,245 (Dep't Commerce June 12, 2013), and accompanying Issues and Decision Memorandum for the Final Results of the 2010 – 2011 Administrative Review, A-570-924, (June 5, 2013) ..............................................................................................6

NON-CONFIDENTIAL VERSION

**RESPONSE TO COMMENTS IN OPPOSITION TO REMAND RESULTS OF
DEFENDANT-INTERVENORS CATFISH FARMERS OF AMERICA, ET AL.**

## I.    INTRODUCTION

On behalf of Plaintiffs NTSF Seafoods Joint Stock Company ("NTSF") and Vinh

Quang Fisheries Joint Stock Company, we respectfully submit this response to the comments on

the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant

to Court Remand, *NTSF Seafoods Joint Stock Company and Vinh Quang Fisheries Corporation v.*

*United States,* Court No. 19-00063, Slip Op. 20-180 (CIT December 21, 2020) filed by

Defendant Intervenors Catfish Farmers of America, Alabama Catfish Inc., America's Catch,

Consolidated Catfish Companies LLC, Delta Pride Catfish, Inc., Guidry's Catfish, Inc.,

Heartland Catfish Company, Magnolia Processing, Inc., and Simmons Farm Raised Catfish,

Inc. (collectively "CFA").  *See* Def.-Intervenors' Comments Opp'n Remand Results

(Confidential Version), ECF No. 83, May 11, 2021 ("CFA Cmts. Opp'n"); *see also* Final Results

of Redetermination Pursuant to Court Remand, *NTSF Seafoods Joint Stock Company and Vinh*

*Quang Fisheries Corporation v. United States,* Court No. 19-00063, Slip Op. 20-180 (CIT

December 21, 2020), ECF No. 78-1, Mar. 23, 2021 ("*Remand Results*").  The *Remand Results*

cover an appeal of Commerce's final results in the fourteenth administrative review of the

1

antidumping duty order on *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 84

Fed. Reg. 18,007 (Dep't Commerce Apr. 29, 2019) (final results, and final results of no

shipments of the antidumping duty administrative review; 2016–2017) ("*Final Results*"), and

accompanying Memorandum to Jeffrey I. Kessler, Assistant Secretary for Enforcement and

Compliance, re: "Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and

Decision Memorandum for the Final Results of the Fourteenth Antidumping Duty

Administrative Review: 2016–2017" (Apr. 19, 2019) ("Final Decision Memo").

On December 21, 2020, the Court remanded Commerce's denial of byproduct offsets for

NTSF's sales of fish oil and fish meal in light of potentially contradictory evidence on the record

that may appear to show that NTSF sold fish oil and fish meal byproducts during the period of

review ("POR"). *NTSF Seafoods Joint Stock Company and Vinh Quang Fisheries Corporation v.*

*United States*, 44 CIT __, __, 487 F. Supp. 3d 1310, 1323 (2020) ("*Remand Order*"). The Court

remanded the *Final Results* for Commerce to "explain its analysis of the record evidence cited by

NTSF or otherwise change its determination." *Id.*

CFA objects to Commerce's determination, after remand, to grant NTSF a byproduct

offset as unsupported by substantial evidence because it argues that: (1) NTSF did not reconcile

NON-CONFIDENTIAL VERSION

the quantities of fish head and bone inputs to its sales of fish meal and fish oil byproduct outputs,

*see* CFA Cmts. Opp'n 4–10; and (2) Commerce unreasonably selected Indonesian import data

published in the Global Trade Atlas ("GTA") as the best available surrogate value ("SV")

information to value NTSF's fish meal and fish oil byproducts. *Id.* at 13; *see also Remand Results*

6 (adjusting NTSF's margin calculation to reflect fish meal and fish oil byproduct offsets for the

last three months of the POR). For the reasons discussed below, the *Remand Results* comply

with the Court's instructions and are supported by substantial evidence.

## II.    ARGUMENT

For the reasons discussed in further details below, Plaintiffs concur with the comments of

Defendant United States, also filed today, responding to the objections of CFA to the *Remand*

*Results* with regard to Commerce's determinations to: (1) grant NTSF a byproduct offset for fish

oil and fish meal sold during the POR; and (2) calculate the SV of NTSF's fish oil and fish meal

byproducts based on Indonesian import data under harmonized tariff schedule ("HTS")

subheading 2301.20.20 (which covers "Flours, meals and pellets, of fish, with a protein content

of 60% or more by weight") and 1504.20.90 (which covers "Fats and oils and their fractions, of

fish, other than liver oils: Other"), respectively. Commerce's *Remand Results* likewise comply

with the Court's order to consider evidence highlighted by NTSF regarding fish oil and fish

meal sales during the last three months of the POR.  *Remand Order*, 44 CIT at __, 487 F. Supp.

3d at 1323.

### A. COMMERCE'S DETERMINATION TO GRANT NTSF A BYPRODUCT OFFSET FOR FISH OIL AND FISH MEAL SOLD DURING THE PERIOD OF REVIEW IS SUPPORTED BY SUBSTANTIAL EVIDENCE

CFA does not question Commerce's revised finding that, "NTSF sold the toll-produced

fish meal and fish oil during the last three months of the POR and did not sell the fish

head/bone," as Commerce had initially found in its final determination.  Remand Results 6; *see*

*also* Final Decision Memo at 53 (declining to grant a byproduct offset for fish oil and fish meal

because Commerce found NTSF sold its fish head and bone to a third party processor that

produced downstream products (i.e., fish oil and fish meal) for its own account).  Nor does CFA

question that the record supports the basis for Commerce's finding, which is that NTSF's sales

records indicate that NTSF transferred fish head and bone to an unaffiliated toller for further

processing and "retained ownership of the input (head and bone) and the downstream products

(fish meal and fish oil).")  Remand Results 5.

4

Instead, CFA argues that Commerce erred in granting NTSF a byproduct offset for fish

oil and fish meal sold during the POR because it claims NTSF did not reconcile the quantities of

fish head and bone byproducts used by the unaffiliated toller to produce fish meal and fish oil

byproducts with the quantity of the downstream byproducts sold during the POR. *See* CFA

Cmts. Opp'n 3–4. However, Commerce correctly found that NTSF reported the quantity of

fish oil and fish meal produced and sold during the POR. *See Remand Results* 10–11.

Accordingly, for the reasons discussed in greater detail below, Commerce's conclusion that

NTSF substantiated the quantities of fish meal and fish oil produced and sold during the POR is

supported by substantial evidence.

### 1.   Commerce's Practice Does Not Require A Complete Reconciliation of Head and Bone Inputs to Fish Meal and Oil Outputs

CFA misrepresents Commerce's byproduct offset practice by implying that—where, as

here, the byproducts sold result from further processing (i.e., fish head and bone trimmings are

further processed into fish meal and oil)—Commerce requires a complete reconciliation of the

quantities of the input byproduct (i.e., head and bone) to output byproduct (i.e., fish meal and

oil). CFA Cmts. Opp'n 3–4. The determinations cited by CFA do not support CFA's

characterization of Commerce's practice. Rather, the determinations cited by CFA reflect that

5

Commerce's practice is simply to require that a respondent:  (1) provide and substantiate the

quantity of byproducts generated from the production of subject merchandise during the POR;

and (2) demonstrate that the byproduct has commercial value.  *See, e.g., Wooden Bedroom*

*Furniture from the People's Republic of China*, 73 Fed. Reg. 49,162 (Dep't Commerce Aug. 20,

2008) (final results of antidumping duty administrative review and new shipper review), and

accompanying Issues and Decision Memorandum for the Final Results of Antidumping Duty

Administrative Review and New Shipper Review of Wooden Bedroom Furniture from the

People's Republic of China at 70–71, A-570-890, (Aug. 11, 2008), *available at*

https://enforcement.trade.gov/frn/summary/prc/E8-19303-1.pdf (last visited June 11, 2021)

("Wooden Bedroom Furniture from PRC IDM") (stating that a respondent "must first provide

and substantiate the quantity of by-product it produced from subject merchandise during the

POR"), *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China*, 78

Fed. Reg. 35,245 (Dep't Commerce June 12, 2013) (final results of antidumping duty

administrative review; 2010–2011), and accompanying Issues and Decision Memorandum for

the Final Results of the 2010 – 2011 Administrative Review at 34, A-570-924, (June 5, 2013),

*available at* https://enforcement.trade.gov/frn/summary/prc/2013-13985-1.pdf (last visited June

11, 2021) ("PET Film from the PRC IDM") (stating that a respondent must substantiate the quantity of byproducts generated from production of subject merchandise and denying a byproduct offset where the respondent in question failed to substantiate the production quantities of byproducts generated during the POR).

Contrary to CFA's unsupported claims, Commerce does not have a specific methodology for verifying the quantities of byproducts reported by a respondent. At times, Commerce may inquire further or require adjustments to ensure that the claimed byproduct offset does not exceed the amount of byproduct actually generated during production. *See, e.g., Mid Continent Nail Corp. v. United States*, 34 CIT 498, 511 (2010) (Commerce declined to include sale of certain materials as an offset because it found at verification that the respondent included the sale of materials unrelated to production as a byproduct offset), PET Film from the PRC IDM at 30–35 (declining to grant a byproduct offset where the respondent could only report the quantities of byproducts sold, but not quantities byproduct generated in production because the respondent did not record quantities at the time of production in the normal course of business). In other words, what level of further inquiry or supporting documentation, if any, Commerce may require, depends upon the facts of the case and is soundly within Commerce's discretion.

Thus, Commerce's practice is merely to require a respondent to report the quantities of

byproducts produced during the POR.

The record reflects that Commerce had ample basis to credit NTSF's reported byproduct

quantities over NTSF's speculation that the reported quantities could be inaccurate. The record

likewise supports Commerce's observation that it did not request that NTSF reconcile fish head

and bone transfers from NTSF to its unaffiliated toller for the last three months of the POR.

Remand Results 11.

CFA mischaracterizes language in the Department's questionnaires to claim Commerce

did request a reconciliation of the quantities of fish head and bone byproduct inputs to quantities

of fish meal and oil byproduct outputs. CFA Cmts. Opp'n 4–6. First, CFA highlights language

pertaining to disposition of byproducts or co-products that are reintroduced into production. *Id.*

at 5 (*quoting* Letter from Paul Walker, Program Manager, AD/CVD Operations, Office V, re:

"Antidumping Duty Non-Market Economy Questionnaire," PD 58, at D-10 (Nov. 21, 2017)

("AD Questionnaire"). It is uncontroverted that NTSF did not reintroduce fish oil or fish meal

byproducts into its production of frozen fish fillets. Therefore, the quoted language is

inapplicable to NTSF. Rather, in accordance with Commerce's practice, Commerce's

questionnaire required that NTSF provide production records demonstrating production of each

byproduct during one month of the POR and evidence of sales and evidence of payment of the

sale for the largest month of sales.  AD Questionnaire at D-9–10.  Second, CFA distorts

language in Appendix V of the AD Questionnaire requiring NTSF to reconcile the production

and sales quantities to its accounting system—which NTSF did—to claim the questionnaire

requires a reconciliation of fish head and bone production to fish oil and meal production.  CFA

Cmts. Opp'n 5.  Therefore, Commerce's finding that NTSF provided all requested

documentation—and that Commerce did not require a separate reconciliation of head and bone

transfers for the last three months of the POR—are supported by the record.

     As discussed in further detail below, the record thoroughly supports Commerce's

conclusion that NTSF reported the production quantities of fish head and bone byproduct

generated during the POR and the portion transferred to an unaffiliated toller for processing into

fish meal and oil during the POR.  *See Remand Results* 10–11.  In other words, NTSF reported

both the quantities of fish head and bone generated in its production of subject merchandise and

the quantities of fish meal and oil produced by its unaffiliated toller.  Letter from Trade Pacific

PLLC, "Section D Resp. and Section D Appx. Resp." at Ex. D-13, CD 92–95 (Jan. 18, 2018)

9

("NTSF Sec. D Resp.") (reporting the monthly quantities of head and bone sent by NTSF to its

unaffiliated toller for processing and the quantities of fish oil and fish meal, respectively,

processed by the toller and sold by NTSF). Moreover, CFA points to no record evidence to

support its speculation that NTSF's toller could have "mixed-in" fish waste from other sources in

the reported quantities of fish oil and meal produced or that NTSF could have sold fish oil and

meal produced entirely from another's company's fish head and bone. See CFA Cmts. Opp'n 8.

Neither the information requested ion Commerce's questionnaires nor Commerce's practice

detracts from Commerce's determination that NTSF substantiated the quantities of fish oil and

meal produced and sold during the POR.

> 2.  **Commerce's Conclusion That NTSF Reliably Reported the Quantities of Fish Oil and Fish Meal Byproducts Produced and Sold During the Period of Review is Supported by Substantial Evidence**

The record likewise supports Commerce's conclusion that NTSF reported the production

quantities of fish head and bone byproduct generated during the POR and the portion

transferred to an unaffiliated toller for processing into fish meal and oil during the POR. *See*

*Remand Results* 10–11. Specifically, NTSF reported the quantities of head and bone output for

processing during the months May through July in which it reported sales of fish oil and fish

NON-CONFIDENTIAL VERSION

meal. *See* NTSF Sec. D Resp. at Ex. D-13 (reporting [         ] kilograms ("kg") of fish head

and bone output by NTSF and sent to its unaffiliated toller for processing during the months

May through July; and reporting [         ] and [         ] kgs, respectively, of fish oil and

fish meal production and sale during the same period).  The record equally supports Commerce's

finding that NTSF reconciled it sales of byproducts with the byproducts reported in its factors of

production ("FOP") database.  *See* Letter from Trade Pacific PLLC, "NTSF's Resp. to the

Department's Supplemental Sections C and D Questionnaire" at CD-42–43, Ex. CD-44, CD

179–197 (May 15, 2018) ("NTSF Supp. CD Resp.") (containing a reconciliation the quantities

and values of NTSF's sales of byproducts to its sales, ledger, trial balance, and audited financial

statements).

CFA cannot argue that NTSF did not report the quantities of fish head and bone

generated in production or the quantities transferred to its unaffiliated toller for processing.

Instead of highlighting evidence undermining the reported quantities of byproducts produced

and sold by NTSF, CFA speculates that those reported quantities must be inaccurate.  *See* CFA

Cmts. Opp'n 6–10.  NTSF addresses each unfounded hypothesis in greater below.

First, CFA speculates that the quantities of fish head and bone byproducts reported by NTSF cannot be accurate because there is a miniscule observed difference of between the total fish head and bone NTSF reported generating during the POR and that it reported selling as a byproduct or transferring for further processing. CFA Cmts. Opp'n 7. But, neither hypothesis undermines Commerce's finding that NTSF reported the quantities of fish head and bone inputs and the quantities of fish meal and oil outputs produced and sold for each month of the POR. Remand Results 11; *see also* NTSF Sec. D. Resp. at Ex. D-13 (reporting the monthly quantities of head and bone sent by NTSF to its unaffiliated toller processing and the quantities of fish oil and fish meal, respectively, generated by the toll processor and sold by NTSF).

Commerce reasonably discounted the significance of the observed difference of 0.036 percent between the total fish head and bone generated and the sum of: (1) the quantity of fish head and bone NTSF reported selling during the months August through April; and (2) the quantity of fish head and bone NTSF reported transferring to its unaffiliated toller during the months May through July. *Remand Results* 11. CFA speculates that this observed difference may be greater than Commerce states because Commerce lacks a complete reconciliation of fish head and bone byproduct inputs and fish meal and oil byproduct outputs to verify the magnitude

of the difference.  CFA Cmts. Opp'n 7.  But CFA points to no concrete record evidence that

calls into question the accuracy of NTSF's reported quantities of fish head and bone and fish

meal and oil produced and sold.  Therefore, Commerce's evaluation of the record evidence that

the observed difference was too small to undermine the accuracy of NTSF's reported byproduct

production and sales quantities is supported by substantial evidence.

Second, CFA speculates that NTSF's reported production quantities of fish meal and fish

oil generated by its unaffiliated toller from fish head and bone supplied by NTSF cannot be

accurate because the unaffiliated toller produced fish oil for entities other than NTSF.  *Id.* at 8–

10.  CFA points to no record evidence to support its theory that NTSF's toll processor could

have "mixed-in" fish waste from other sources in the reported quantities of fish oil and meal

produced or that NTSF could have sold fish oil and meal produced entirely from another's

company's fish head and bone.  *Id.* at 8.  The fact that an unaffiliated producer of fish oil and

meal would have many clients is not surprising.  Nor does the fact that NTSF accounted for a

[                                             ] production of fish meal and oil during the months

May through July indicate that the produced quantity reported by NTSF is unreliable.  As

Commerce observed, the fact that the input quantities of fish head and bone and output

13

quantities of fish meal and oil are not reconciled is the result of Commerce's decision not to

request a reconciliation, *see Remand Results* 11, not because the quantities reported by NTSF are

inaccurate. The mere possibility of inaccuracy—clearly discounted by Commerce because it did

not request such a reconciliation—does not render Commerce's determination that NTSF

accurately reported the quantities of byproducts produced unsupported by substantial evidence.

Next, CFA highlights the [                                    ] of the ratio of fish head and bone to

fish oil and fish meal output derived by CFA from the monthly quantities reported by NTSF's

unaffiliated toller to argue that the reported monthly production quantities are not credible.

CFA Cmts. Opp'n 10. Commerce considered CFA's observation, and declined to discount

NTSF's reporting without other evidence indicating the ratios are anomalous. *Remand Results*

12. As Commerce correctly observed, NTSF reported in its tolling contract the output

specifications the toller should be following. *Id.* (*citing* NTSF Supp. CD Resp. Ex 47).

Specifically, NTSF's contract with its toller requires precise standards to be met in the

production of the fish oil processed from the fish head and bone provided. NTSF Supp. CD

Resp. Ex 47 (specifying that fish oil must have a [

] and that fish meal must have a [

14

]).

CFA points to no record evidence that indicates the ratio of fish head and bone input to fish

meal and oil output should [                    ] from month to month where the aforementioned

values are strictly controlled or that otherwise detracts from Commerce's conclusion that CFA's

observations about the accuracy of the monthly generation ratios reported by NTSF are

speculative. *Remand Results* 12. Moreover, given that NTSF only reported production data for

fish oil through its unaffiliated toller for three consecutive months during the POR, the apparent

[        ] of the usage ratio alone over a relatively short period occurring in the same season

does not render Commerce's weighing of this evidence unreasonable.[1]

    Finally, CFA claims that the reported quantities of fish oil produced by NTSF during the

POR are not credible because the unaffiliated toller's records show it generated [

    ] fish meal and oil from inputs coming from NTSF than input material coming from

other sources. CFA Cmts. Opp'n 9. Commerce reasonably determined that comparing these

---

[1] As CFA acknowledges, *see* CFA Cmts. Opp'n 9, the usage ratio derived by CFA from NTSF's
reported fish head and bone input and the unaffiliated toller's fish oil and meal output data was [
        ] across the three months of fish oil and meal production.

ratios across customers is of very little probative value where Commerce lacks information to

compare the specifications for the fish meal and oil processed for NTSF versus that processed for

other customers. Remand Results 12. CFA dismisses Commerce's reasonable weighing of the

evidence by claiming that Commerce did request input and output specifications for byproducts

processed by the unaffiliated toller for customers other than NTSF. CFA Cmts. Opp'n 10. But,

CFA highlights nowhere in the record where Commerce requested input/output ratios from

NTSF's unaffiliated toller on a customer-specific basis or that required NTSF to report the

specifications of its unaffiliated toller's other customers. Instead, CFA grounds its claim in an

expansive—and unsupported—reading of the need to "substantiate" the quantities of byproducts

produced that is not reflective of Commerce's actual practice. *See id.* (citing CFA's

mischaracterization of Commerce's practice, which CFA incorrectly claims requires a complete

reconciliation of byproduct input quantities produced with further processed byproduct output

quantities).

In sum, CFA highlights no reliable record information demonstrating that the monthly

quantities of fish head and bone inputs generated by NTSF or the monthly quantities of fish

meal or oil processed from those inputs by the unaffiliated toller were anomalous. Therefore,

Commerce's determination to grant NTSF a byproduct offset based on its conclusion that

NTSF's reported byproduct production quantities were reliable is supported by substantial

evidence.

B.   **COMMERCE'S SELECTION OF INDONESIAN IMPORT DATA TO VALUE NTSF'S FISH OIL AND FISH MEAL BYPRODUCTS IS SUPPORTED BY SUBSTANTIAL EVIDENCE**

Commerce determined that Indonesian import data published by GTA represents the

best available information to value NTSF's fish oil and fish meal byproducts because the GTA

data is: (1) publicly available; (2) more representative of a broad market average; and (3) more

specific as to protein content for the fish meal byproduct. *Remand Results* 14–15. Specifically,

Commerce used Indonesian import data from subheading 2301.20.20 (which covers "Flours,

meals and pellets, of fish, with a protein content of 60% or more by weight") to value fish meal

and 1504.20.90 (which covers "Fats and oils and their fractions, of fish, other than liver oils:

Other") to value fish oil. Memorandum to The File, re: "Antidumping Duty Administrative

Review of Frozen Fish Fillets from Vietnam: Final Remand Margin Calculation for NTSF

Seafoods Joint Stock Company" at Attach. 1, Rem. PD 9 (Mar. 23, 2021). Commerce further

17

noted that it has relied on the same import data to value these byproducts in the past five

segments of this proceeding.  Remand Results 15.

CFA highlights evidence it claims demonstrates the superior specificity of the Indonesian

price quotes placed on the record by CFA relative to Indonesian import data.  CFA Cmts.

Opp'n 10–13.  As an initial matter, even if the Indonesian price quotes were more species-

specific, Commerce's selection of the GTA data over the price quotes would still be supported by

substantial evidence because the GTA data is publicly available—unlike the price quotes solicited

by CFA solely for the purposes of this proceeding—and more representative of a broad market

average.  *See Remand Results* 14–15.  While CFA claims that the Indonesian price quotes reflect

"a broad Indonesian-market average" since they were collected from a number of sources, *see*

CFA Cmts. Opp'n at 13, the pricing data collected from an unspecified number of sellers of

pangasius byproducts in Indonesia cannot possibly be as broadly reflective as country-wide

import data.  *See* Letter from Cassidy Levy Kent (USA) LLP, re: "Certain Frozen Fish Fillets

from the Socialist Republic of Vietnam: Petitioners' Submission of Proposed Factor Values," at

Exs. I-8A, I-8B, PD 327 (Mar. 22, 2018) ("CFA SV Submission") (containing pricing gathered

by a single consultant from sellers of pangasius byproducts in various regions of Indonesia).

18

Moreover, whereas the price quote data may be publicly available in that it was filed as public

information on the record of this proceeding, the price quotes were gathered by a consultant

hired by CFA for purposes of this proceeding and not made available in any publication. *See,*

*e.g.,* id. (pp. 1–2, ¶¶ 1–2) (containing an affidavit from the Indonesian law firm Frans &

Associates Law Office "engaged by Cassidy Levy Kent (USA) LLP . . . to obtain information

regarding the production and sale of pangasius byproducts in Indonesia and stating that the

consultant "searched for sellers of pangasius byproducts in Indonesia" to obtain the attached sales

price list). Therefore, even if CFA's specificity concerns had merit, the record supports

Commerce's selection of Indonesian import data because it better represents a broad market

average and comes from publicly available national statistics unlike CFA's privately obtained

price quotes.

Even if Commerce's other SV selection criteria were insufficient to outweigh the

specificity arguments made by CFA, Commerce reasonably determined that the species-

specificity concerns highlighted by CFA are not significant enough for byproduct outputs to

overcome other concerns regarding the price quotes on the record. *See* Remand Results 14–15.

CFA emphasizes record evidence of the high costs of importing pangasius products to argue that

the import data must not reflect species-specific byproduct pricing. CFA Cmts. Opp'n 11.

However, high costs of importation do not demonstrate byproducts are not imported.

Commerce considered this evidence and reasonably concluded that the fact that the specific

HTS subheadings identify the byproducts in question outweighs the evidence offered by CFA

that, at most, tends to show some barriers to international trade. *See* Remand Results 15

(finding "it is beyond dispute that fish meal and fish oil are by-products and they are traded

internationally given that they appear in the GTA data").

Next, CFA highlights evidence that it claims undermines the species-specificity of the

GTA data used by Commerce to value fish meal and oil byproducts. CFA Cmts. Opp'n 12.

While CFA claims Commerce found its species-specificity arguments lacked merit, *see id.*,

Commerce acknowledged that the GTA data are not species specific. *See* Remand Results 15.

Commerce nonetheless found other specificity concerns to outweigh CFA's species-specificity

points. *Id.* Specifically, Commerce found that the GTA import data as to fish meal is more

specific as to protein content for fish feed. *Id.*

More generally, Commerce did not find that the species-specificity evidence highlighted

by CFA is irrelevant. Rather, Commerce found that other specificity concerns—along with

broad market average and public availability concerns—outweighed species-specificity concerns.

*Id.* While CFA highlights record evidence that fish oil from some species of fish may be preferred or sell at higher prices than other species, *see* CFA Cmts Opp'n 12 (citing evidence that it claims shows that fish oil derived from marine species of fish sell at higher prices relative to freshwater fish), the evidence does not show species-specificity is the *primary or determining* factor in the pricing of fish meal or oil or that otherwise renders unreasonable Commerce's consideration of other SV selection (i.e., broad market average and public availability) to outweigh species-specificity.

For these reasons, Commerce's selection of Indonesian import data to value NTSF's fish oil and meal byproducts is supported by substantial evidence.

## III.   CONCLUSION

For these reasons, the following Commerce determinations in the *Remand Results* comply

with the Court's remand instructions and are supported by substantial evidence:  (1) to grant

NTSF a byproduct offset for fish oil and fish meal sold during the POR; and (2) to calculate the

SV of NTSF's fish oil and fish meal byproducts based on Indonesian import data.  Therefore,

Plaintiffs respectfully request that the Court sustain Commerce's *Remand Results*.

> Respectfully submitted,
>  /s/  Jonathan M. Freed
> Robert G. Gosselink
> Jonathan M. Freed
> Kenneth N. Hammer
>
> **TRADE PACIFIC PLLC**
> 700 Pennsylvania Avenue, SE
> Suite 500
> Washington, DC  20003
> (202) 223-3760
>
> Counsel to Plaintiffs
> NTSF Seafoods Joint Stock Company and Vinh
> Quang Fisheries Corporation

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NTSF SEAFOODS JOINT STOCK COMPANY and VINH QUANG FISHERIES CORPORATION,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>    and,<br><br>CATFISH FARMERS OF AMERICA, ET AL.,<br><br>        Defendant-<br>        Intervenors. | **Before:** Jennifer Choe-Groves,<br>        Judge<br><br>Ct. No. 19-00063 |

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Plaintiffs'

Response to Comments in Opposition to Remand Redetermination of Defendant-Intervenors

Catfish Farmers of America et al., dated June 11, 2021, complies with the word-count limitation

described in the Standard Chambers Procedures.  The memorandum of law contains 4,552

words, according to the word-count function of the word-processing software used to prepare

the memorandum.

Respectfully submitted,

 /s/  Jonathan M. Freed

Jonathan M. Freed

TRADE PACIFIC PLLC

700 Pennsylvania Avenue, SE

Suite 500

Washington, DC  20003

(202) 223-3760

Counsel to Plaintiffs

NTSF Seafoods Joint Stock Company and Vinh

Quang Fisheries Corporation

**Date:**  June 11, 2021

2